## BUCKNER *vs.* CHAMBLISS.

1. Proof of prior possession of land for more than seven years is sufficient to authorize a recovery by a plaintiff in ejectment against a mere wrong-doer.

2. The attornment of the plaintiff's tenant to defendant without the knowledge of plaintiff, and such tenants, continued possession under defendant, is not such adverse possession as will create a statutory bar to plaintiff's right of action.

3. When land is levied on by the sheriff under executions that are subsisting liens and unpaid liens against the land, and is fairly and legally

sold and bid off by three persons jointly, such sale is not affected by the previous fraudulent conduct of one of them in obtaining a note against a debtor, suing out attachment and levying the same on the land, especially when the land is not sold under such attachment, nor by the procurement or contrivance of the one of the purchasers who sued out the fraudulent attachment.

4. When three persons buy land on joint account at sheriff's sale, their agreement to do so, and not to bid against each other, does not vitiate the sale.

5. When land is fairly sold by the sheriff, under subsisting executions, and the purchasers at the sale pay up all of the liens, or all that the sheriff requires, and gives their note to the sheriff for the balance, and the sheriff executes a deed to the premises, the non-payment of the balance of the bid will not vacate the title. The sheriff takes the note at his peril.

Complaint for land, in Sumter county. Tried before Judge ALLEN, at the April Adjourned Term, 1859.

This suit was brought on the 17th day of February, 1857, by the administrator of Jesse Harris against Reason Buckner, the plaintiff in error, to recover lot of land No. 210, in the 26th district of originally Lee, now Sumter county.

The plaintiff in the Court below introduced, on the trial, A. M. D. King, who testified that Jesse Harris was in possession, and claimed to be the owner of the premises in dispute in the years 1847–'48, and for several years before, and up to the time he went to Louisiana, in 1848 ; he returned for a short time in 1851 or '52, and again in 1854 or '55 ; at the time he left, he left James Baker, as his agent, in possession of the lot ; defendant was in possession of the lot at the commencement of the suit, and had been since 1851 or '52 ; Harris' possession extended back as far as the year 1840.

The plaintiff having here rested the case, counsel for defendant moved for a non-suit, which the Court refused, and the defendant excepted.

Counsel for defendant then offered in evidence a deed from the Sheriff of Sumter county, for the premises in dispute, to James Salter, William Morris and Wright Brady, dated the 22d day of December, 1849, and which recites that the premises specified had been levied on, and were sold at sheriff's

sale on the 7th day of August, 1849, by virtue of three *fi. fas.* two issued out of the Superior Court of Sumter county, one in favor of Thomas Applewhite, against Jesse Harris, and the other in favor of the officers of Court, against Jesse Harris; and the third issued out of the Inferior Court of Sumter county, in favor of officers of Court against said Harris.

These *fi. fas.* were then also put in evidence. The one in favor of Thomas Applewhite is for the principal sum of $280, besides interests and costs, and shows the levy was made on the 29th day of June, 1849; also, that the lot was sold at the time recited in the deed, for the sum of $300 00, $46 62 of which were applied to the costs of levy and sale, and the two cost *fi. fas.*, leaving a balance "held up" in the officers' hands of $253 37. The other two *fi. fas.* were for $15 00 and $13 12 respectively, and had endorsed on them the same entries as the first, as to the levy and sale.

The defendant also put in evidence a deed from James Salter, William Morris and Wright Brady for the said lot to Reason Buckner, said defendant, dated the 24th day of December, 1855.

Counsel for defendant then offered to prove that after the sheriff's sale in 1849, James Baker, without being ejected from the premises by the sheriff, attorned to and rented the premises from B. Easterling, who purchased the same from Morris, Salter and Brady, and held the same as his tenant for the balance of the year 1849 and '50, until Buckner took possession in 1851.

This was objected to. The objection was sustained by the Court, and defendant excepted.

Plaintiff then proved by Green M. Wheeler, the former deputy sheriff, that he levied the *fi. fa.* upon the lots, as shown by the levies, as deputy sheriff; that he levied the Applewhite *fi. fa.* by the directions of General Warren, one of the attorneys for the plaintiff therein; and at the same time levied the two *fi. fas.* in favor of the officers of Court, which he found in the sheriff's office. The sale was fair, so far as witness knew. After the sale, Salter, one of the purchasers, came to him and told him he believed the Applewhite *fi. fa.* was paid off, and that he had an attachment on the land that in such event would come in and take the surplus of the money, and proposed to give the purchasers' notes for all

over the expenses of sale and costs due on the three *fi. fas.*
which witness took, no money being paid except the costs
and expenses of the sale as above, which was $46 and some
cents.   Judge King, attorney for plaintiff in Salter's attach-
ment, instructed witness to hold the sheriff's deed until he
should be paid thirty dollars and the jury fee, his fees and
costs in the attachment; and the deed was not given up and
the credit made upon the attachment judgment until some
two or three years ago, and since the commencement of this
suit, when the same was done by T. C. Sullivan, as his at-
torney, and by his directions.

Plaintiff also put in evidence the record of the said attach-
ment case, which shows that on the 2d day of Februrary,
1849, James Salter made the affidavit on which the attach-
ment issued, stating therein that Jesse Harris was indebted
to him in the sum of $125 75, with interest thereon from
the 25th day of June, 1844.

The note copied in the attachment declaration is payable
at one day after date to R. W. Oats, or bearer, for $175 75,
made by Jesse Harris, and dated the 24th day of February,
1844.   This attachment was levied on the said lot on the
12th day of February, 1849.

Defendants admitted, for the purpose of a trial, that the
Applewhite *fi. fa.*, had been paid by Jesse Harris, as to the
principal and interest, and that at the time of the sale noth-
ing was due thereon except the Court costs.

Plaintiff then introduced the evidence of Susan Hamill,
who testified, by commission, that she was present when Mr.
Salter applied for the note; Mrs. Oats refused to give Mr.
Salter the note, because she had received satisfaction for it;
and after that, he requested Mrs. Oats to let him look over
her papers for a certain paper; after getting the note, Mrs.
Oats said to him that if the note should ever come against
her it would run the old man Oats crazy; Salter told her
that the note should never injure her; Salter said he knew
(a) lot of land he could sell with the note—naming the Green
Pond lot, which James Baker was then living on—" which
he had no more right to than he, Salter, or any other person,
which Salter said he could sell with that note and make some-
thing;" it was not by her consent he got the note; did not
recollect as to anything being said about what the note was
given for, or the amount of the note at that time; witness

cannot read or write; the conversation took place either in the latter part of 1848 or the first of 1849; according to her recollection, the note was made payable to Mr. Oats by Jesse Harris; he told witness the note never should hurt her; all she knows about the note is what she heard Mr. Salter and Mrs. Oats say; does not know the amount of the note.

Patrick Brady, introduced by plaintiff, testified, that he was present on one occasion when James Salter applied to old Mrs. Oats—old man Oats being a very old and infirm man, near one hundred years old, lying on the bed—for Jesse Harris' note; the old lady did not wish to let him have it, because there was some difficulty about the note on account of payment, failure of consideration, or something of the kind, does not remember what; Salter said Harris had run away and would not come back, and the money could be made out of the Green Pond lot; told Mrs. Oats the note should never come against her or the old man; that they should not be hurt; this was before Salter got the note; Salter did not get it then, but witness afterwards had a conversation with Salter, and he told him he had got the note, and intended to make the money out of the Green Pond lot by attachment; don't think he ever told Wright Brady or William Morris what Salter said, or how he got the note; he told witness he did not pay anything for the note.

William Coker, in behalf of defendant, testified, that defendant, Buckner, went into the actual possession of the premises in dispute the last of 1851 or first of 1852, and that there was in cultivation on the premises from 90 to 100 acres, worth $1 50 per acre for rent; that he never knew the premises before defendant's occupation of them.

William Easterling also testified, for defendant, that he bought the premises of Wright Brady, James Salter and William Morris in 1849, took their bond for titles, and gave his note to them for the purchase-money, which he took up; in 1849 he rented the land to James Baker for the balance of the year, and afterwards sold it to him and transferred the bond to him, who sold to Buckner and also transferred said bond; and Morris, Brady and Salter made Buckner a deed in pursuance of said bond thus transferred; the defendant had put up a small house worth from $35 00 to $50 00.

The testimony here closed, and at plaintiff's request, in writing, the Court charged the jury as follows:

1st. If the jury believe, from the evidence, that Salter was guilty of a fraud, and that Brady and Morris knew of it, they stood in no better position than Salter.

2d. If the jury believe, from the testimony, that Morris, Brady and Salter combined not to bid against each other, then the sale was void.

3d. To make a sheriff's sale good, the purchase money must be paid; and if the jury believe that Morris, Brady and Salter never paid up the bid, then they acquired no title.

4th. If the jury believe that at the time Buckner bought, Harris was in possession by his tenant, Baker, then Buckner is bound, and charged with notice whatever right or title Harris had.

5th. A purchaser at sheriff's sale, void on the ground of public policy, cannot be purged by being for the benefit of defendant, unless with his consent.

To which charges defendant, by his counsel, excepted.

B. HILL; LANIER & ANDERSON, for plaintiff in error.

McCAY & HAWKINS, *contra.*

*By the Court.*—LYON, J., delivering the opinion.

1. The plaintiff, in the Court below, relied, for recovery of the premises in dispute, upon proof of prior possession. The proof showed that he had been in possession of the lot sued for from 1840 to the time he moved to the State of Louisiana, and that he then left one James Baker in possession, as his tenant. On this proof, the defendant was not entitled to a non-suit. Prior possession will prevail in ejectment over a subsequent one acquired by mere entry, without any lawful right. *Johnson vs. Lancaster*, 5 *Ga.*, 39.

2. The attornment of Baker, the plaintiff's tenant, to the purchaser at sheriff's sale, and his subsequent possession of the premises under the purchaser, could not be such adverse holding against the plaintiff as would create a statutory bar to his right of action, and the Court properly rejected the evidence.

3. The conduct of Salter, in getting possession of the note on Harris from Oats, suing out an attachment upon it, and

causing the land to be levied on, was most wrongful and fraudulent; but that conduct of his did not lead to the sale of the lot; that is, the land was not sold under that attachment, but under executions that were open, unpaid, and subsisting liens against the land, over which Salter had no control. The land was levied on by the sheriff of the county, having been pointed out by the plaintiff's attorney in one of the executions, for that purpose. To all this Salter was no party in the levying upon, pointing out, or sale of the lot, nor did he have any interest in the executions selling the lands. The attachment he had sued out was not then in judgment, but the land was sold fairly and in good faith by the sheriff for the purpose only of producing satisfaction of the liens levied. The sale was a good one, and Salter's fraudulent conduct in procuring the note, suing out the attachment, etc., could not, and did not, affect that sale, and he was as competent to buy the land at such sale as any one. The charge of the Court, in this respect—that if Salter was guilty of a fraud and Morris and Brady knew of it, they stood in no better position than Salter—was erroneous; for if the Court referred to Salter's fraud in respect to his attachment, it had no relevancy, and did not affect the sale or his purchase, as we have said, if the Court referred to any fraud of Salter's in the purchase, there is no evidence of any to warrant the charge.

4. The proof was, that Morris, Brady and Salter bought the land jointly at the sheriff's sale; in fact, the sheriff's deed is made to them. The Court charged the jury, "that if they combined not to bid against each other, the sale was void." This was error. It was equivalent to saying that persons could not buy property at sheriff's sale on joint account, for every agreement to buy on joint account implies an agreement that they will not bid against each other. There is no such rule of law as that. If they had used any means unfairly or fraudulently to prevent other persons from bidding for the property, that would have defeated the sale as to them; and that is what we suppose the Court intended to charge; but stated broadly as the charge is in the record, it makes a very material difference.

5. After the sale was over and the land bid off by Morris, Brady and Salter, Salter remarked to the sheriff that he thought the Applewhite *fi. fa.* one of the three under which

Buckner *vs.* Chambliss.

the land was sold, was paid off, and if it should so turn out, he thought he would get the balance of the money on his attachment, and proposed to the sheriff to give the sheriff the purchaser's note for the balance of the bid, after paying off the expense of the sale and the costs due on the three *fi. fas.* To this the sheriff consented, and the purchasers paid up the expenses and costs due on the three *fi. fas.*, amounting to something like $41 00, and gave the sheriff their notes for the balance of the sale. Afterwards, and after he had made the deed to the purchaser, but before he had delivered it to the purchaser, King, the attorney of Salter in the attachment, gave the sheriff notice not to turn over the deed until his fees in the attachment—amounting to some thirty dollars—was paid; and the sheriff held the deed accordingly, and it was not given up until two or three years previous to the trial. On this proof, the Court charged the jury, that "to make a sheriff's sale good, the purchase-money must be paid, and if the jury believe that Morris, Brady and Salter never paid up the bid, then they acquired no title." Under the facts of this case the instruction was erroneous. The land was legally sold, as we have shown, and when the sheriff executed the deed the title passed away from the defendant in execution and the plaintiff in this suit; and if the sheriff chose to make the title without getting the money, that is a question between him and the purchaser, there being no fraud in the sale itself. The defendant in execution and the plaintiff here is not affected by the non-payment of the money. It makes no difference with him, for the sheriff is responsible to him for the proper application of the money, and when he is called upon to account, it will be no reply for him to say that he did not get it. He is bound to have it. This is obliged to be so; for in this case, when the purchasers acted in good faith and paid up a part of the bill, how could the sale be good as to part, and bad as to part? The purchasers paid up all that the sheriff required, and had he required the whole, the presumption is, that they would have paid the whole.

Judgment reversed.