McMILLAN *v.* HARRIS *et al.,* executors.

1. One who bids at a public sale, not because of any desire to purchase, but merely for the purpose, either in his own interest or that of another, to run up the price, is not a "puffer," if in case his bid is the last and highest he can be compelled by the person conducting the sale to take and pay for the property; and this is so though under an arrangement with another, or others, to whom the proceeds of the sale, or a considerable portion thereof, will ultimately go, he will not be compelled to keep and pay for the property.
2. Accordingly, it is neither contrary to law nor public policy for persons who will be entitled to the proceeds of land sold by an executor under a decree of court to engage a third person to run the property up to a specified price, with the understanding that if it is knocked down to him they will take it off his hands.

Argued February 16, — Decided February 28, 1900.

Confirmation of sale. Before Judge Falligant. Chatham superior court. June term, 1899.

*Denmark, Adams & Freeman,* for plaintiff in error.

*R. R. Richards, George W. Owens,* and *A. C. Wright,* contra.

Cobb, J.  Stoyell C. Parsons and Elizabeth Catherine Mass, by her father as next friend and guardian, brought suit in the superior court of Chatham county against the executors of the last will and testament of Sarah M. Parsons, and others, alleging in their petition that they were joint owners of certain described realty in the city of Savannah, and praying that a certain deed alleged to be a cloud upon the title of petitioners might be delivered up to be canceled, and that the executors take charge of the realty and dispose of the same for the benefit of petitioners.  When the case came on for a hearing a decree was entered, providing that the trust deed referred to be set aside and canceled, and that the executors "take charge of and dispose of the property set out in said petition, in accordance with the terms of compromise as agreed on," and to this end advertise the property in a designated way for sale at public outcry before the door of the court-house of Chatham county, during the legal hours of sale, to the highest bidder, and report the sale to the court for confirmation.  The sale was had in the manner prescribed in the decree, and on the day fixed in the advertisement the property was sold in several parcels and knocked down to different purchasers.  The executors reported the sale to the court, when it appeared that one of the parcels had been knocked down to T. H. McMillan, the plaintiff in error, for the sum of $14,000.  In answer to the rule nisi calling upon him to show cause why the sale should not be confirmed, McMillan set up that the price at which the property was knocked down to him was the result of "puffing" or "by-bidding" at the sale, done at the instance of parties owning an interest in the property, and in fraud of his rights as purchaser; that the property was run up by the owners thereof, without his knowledge, by bids that were not real or genuine but made for the purpose of puffing the property, and that such conduct rendered the sale illegal and released him from the obligation to pay for the property. After hearing the evidence the judge held that sufficient cause had not been shown to authorize him to refuse to confirm the sale, and an order was passed confirming the sale and directing

McMillan to pay the amount of his bid into the hands of the executors. To this ruling McMillan excepted, assigning as error that the decision of the judge was contrary to law and the evidence; that the evidence required a finding that the sale was puffed, and was therefore illegal.

It appears from the evidence that the petitioners in the original proceeding, Miss Mass and Dr. Parsons, were, under the will of Sarah M. Parsons, entitled each to a one-half interest in the property involved in the present case. Mr. Owens was an attorney at law representing Miss Mass. Mr. Seabrook was an attorney at law representing Dr. Parsons. Mr. Owens was at the sale and made several bids on the property, one of these bids being immediately before the bid of McMillan at which the property was knocked down to him. Mr. Owens was not bidding in his own interest. He was bidding for his client by authority given him to bid such an amount as in his discretion would be necessary to prevent the property from being sold at a sacrifice. It also appears that Mr. Owens and Mr. Seabrook, representing their respective clients, had agreed that the property should not be sold for less than $13,000, and that in pursuance of this agreement Mr. Owens became a bidder at the sale; and it is to be inferred from the testimony that, if the property had been knocked down to him, the purchasers would have been neither himself nor Mr. Seabrook, but their respective clients. It also appears that out of the proceeds of the sale different items of costs and expenses connected with the litigation were to be paid by the executors; the amount of such items which were due and unpaid at the date of the hearing of the petition brought to confirm the sale being more than $250. The auctioneer who conducted the sale was one of the executors, and it appeared that neither in his capacity as auctioneer nor as executor did he have any connection whatever with the arrangement made between Mr. Owens and Mr. Seabrook, and there was no reason whatever why he could not, if the property had been knocked down to Mr. Owens, have treated him as the purchaser and invoked the aid of the court to that end. It appeared distinctly from the testimony that if there was any puffing or by-bidding, neither the auctioneer nor the executors had

any connection with the same, and that it was done without their consent, knowledge, or authority. The controlling question to be determined is, whether the conduct of Mr. Owens, in entering into the arrangement with Mr. Seabrook to bid on the property in behalf of their respective clients so as to prevent its sacrifice, and bidding at the sale for that purpose without the expectation of becoming a purchaser himself, was of such a character as to authorize the court to declare that McMillan was misled, and that for that reason the sale was void and should be set aside. To properly determine this it is necessary to investigate the law of sales at auction and determine who is a puffer at an auction and what conduct would amount to puffing so as to invalidate the sale.

There is no decision of this court bearing directly upon this question. The presence at auction sales of persons who bid for the purpose of inflating the value of the property in behalf of those interested in the sale is a matter at the present time of very common occurrence, and has been from the time that auction sales were first known. This practice has brought about many controversies which resulted in numerous cases, and the effect of such conduct has been discussed by many judges and text-writers. A person of the character referred to is usually denominated a puffer, but he is sometimes referred to as a by-bidder, capper, decoy duck, white bonnet, or sham-bidder. The first time that this question seems to have come before the English courts, so far as the reported cases are concerned, was in the case of Walker v. Nightingale, 3 Bro. P. C. Cas. 263, which was decided in 1726. It was held by the House of Lords in that case that a puffer could not recover compensation for his services, since they were contrary to good faith. The next case in point of time was Bexwell v. Christie, 1 Cow. 395, which was decided by the court of King's Bench in 1776. This was a decision by Lord Mansfield, and as it was rendered prior to the date named in our adopting statute it is controlling authority in this State. Thornton v. Lane, 11 Ga. 500. For this reason it is necessary to examine that case with some care. An action was brought against an auctioneer for selling a horse at the highest price bid for him, contrary to the owner's express

direction not to allow him to go under a larger sum named; and it was held that such an action would not lie, but that it would have been otherwise if the owner had directed the auctioneer to put the horse up at a particular price and not lower. The opinion of Lord Mansfield in the case was as follows:

"The matter in question is in itself of small value; but in respect of the principles by which it must be governed, it is a question of great importance. Since the trial I have mooted the point with many who are not lawyers, upon the morality and rectitude of the transaction. The question is, whether a bidding by the owner of goods at a sale under these conditions, namely, 'that the highest bidder shall be the purchaser, and if a dispute arise, to be decided by a majority of the persons present,' is a bidding within the meaning of such conditions of sale.

"There is no express undertaking on the part of the defendant, nor is it, as has been ingeniously said, a direction that there should be no bidding under 15 l., which might be fair. But the direction given to the defendant is, 'not to let the horse *go under* 15 l.,' which implies there might be a bidding under that sum. The question then is, whether the owner can *privately* employ another person to bid for him? The basis of all dealings ought to be good faith; so, more especially in these transactions, where the public are brought together upon a confidence that the articles set up to sale will be disposed of to the highest real bidder. That could never be the case, if the owner might secretly and privately enhance the price, by a person employed for that purpose; yet tricks and practices of this kind daily increase, and grow so frequent that good men give in to the ways of the bad and dishonest in their own defence. But such a practice was never openly avowed. An owner of goods set up to sale at an auction never yet bid in the room for himself. If such a practice were allowed, no one would bid. It is a fraud upon the sale, and upon the public. The disallowing it is no hardship upon the owner. For if he is unwilling his goods should go at an under price, he may order them to be set up at his own price, and not lower. Such a direction would be fair. Or he might do as was done by Lord Ashburnham, who sold a large estate by auction; he had it inserted in the conditions of

sale, that he himself might bid once in the course of the sale; and he bid at once 15,000 or 20,000 l. Such a condition is fair because the public are then apprised and know upon what terms they bid. In Holland it is the practice to bid downwards.

"The question then is, is such a bidding fair ? If not, it is no argument to say it is a frequent custom. Gaming, stock-jobbing, and swindling are frequent. But the law forbids them all. Suppose there was an agreement to abate so much, which is the case where goods are sold by one person in the trade to another; they abate sometimes 10 or 15 per cent. Such an agreement between the owner and a bidder, at a sale by auction, would be a gross fraud. What is the nature of a sale by auction ? It is that the goods shall go to the highest real bidder. But there would be an end of that, if the owner might privately bid upon his own goods. There is no contract with the auctioneer. He is only an agent between the buyer and seller. He may fairly bid for a third person who employs him, but not for the owner.

"In this case there is another fraud upon the public. For by the catalogue the goods are described to be 'the goods of a gentleman deceased, and sold by order of the executor.' Upon this representation many people would attend to bid on a supposition that the goods were necessarily to be sold at all events, whether valuable or not valuable; whereas they might have their suspicions if they were the property of persons living. Horses, or any other species of property, belonging to persons that are dead, are not so likely to be faulty as those which are parted with by persons in their lifetime.

"We all remember the sale of a gentleman's wines, where vast quantities had been sent in belonging to other persons; and all sold at a very high price under an idea they were his. The consequence was, most of the buyers were taken in.

"Therefore, upon full consideration, I am of opinion, that a bidding by the owner in the manner contended for, and agreeable to the directions given in this case, would have been a fraud upon the sale; and consequently that this action against the defendant as auctioneer can not be maintained."

In Howard v. Castle, 6 T. R. 642, the decision of Lord Mans-

field in Bexwell *v.* Christie was followed by Lord Kenyon. In Wheeler *v.* Collier, 1 Moody & M. 123, 22 E. C. L. R. 487, a sale at which there were two puffers was held to be void, and Lord Tenterden stated that the inclination of his mind was that the employment of only one puffer would avoid a sale. In Crowder *v.* Austin, 3 Bing. 368, 11 E. C. L. R. 184, it appeared that the vendor of a horse stationed his servant to join in the bidding at a public auction, and the servant bid up to 23 pounds after a bona fide bidder had bid 12 pounds. It was held that the sale could not be enforced against a subsequent bidder. In Green *v.* Baverstock, 14 C. B. (N. S.), 108 E. C. L. R. 202, it was held that upon a sale of goods by auction, where the highest bidder is to be the purchaser, the secret employment of a puffer on behalf of the vendor is a fraudulent act and vitiates the sale. In that case Byles, J., said: "The sale is vitiated by the fraud, and void, unless the vendee, with knowledge of the fact, has acted upon it so as to deprive himself of the right to complain. This has been the law of England, and indeed of the whole of Europe, for a very long time indeed. It was a law of universal application even before the Christian era." The decisions of the common-law courts of England have been almost without exception in line with the decision of Lord Mansfield in Bexwell *v.* Christie. The principle at the foundation of this decision was, that for one to offer his property at public outcry to the highest bidder and then secretly arrange with another to bid on the property in his behalf, with the distinct understanding that he was not to incur any liability on his bid, was a fraud upon the right of those who attended the sale in good faith expecting to come into competition with others like themselves who really desired to purchase the property on the best terms possible. The reason for the rule was the palpable fraud upon bona fide bidders. Strange as it may seem, the English Court of Chancery did not follow the rule laid down by Lord Mansfield, but, on the contrary, in a number of decisions this rule was criticised, and the fraud incident to puffing at auctions was not only tolerated but approved of by that court. In Conolly *v.* Parsons, which will be found reported in a note in 3 Vesey Jr.'s Reports, 624, a decision ren-

dered in 1797, Lord Chancellor Loughborough found great fault with the conclusion reached by Lord Mansfield and .also with the reasoning which led him to that conclusion. According to the rule in that case, unlimited puffing was allowable. While the decision last referred to was not followed by the Court of Chancery in all of its bearings, that court held, on different occasions, that the mere fact that one puffer was employed to prevent a sacrifice of the property would not be such a fraud as would vitiate the sale when it was otherwise free from infirmity. In Mortimer v. Bell, reported in 5 American Law Register, 310, it was held by Lord Chancellor Cranworth, that the rule, said to exist in equity, allowing one puffer to be employed, without notice, to prevent a sale at an undervalue, is abstractly less sound than the rule at law, which declares such employment to be fraudulent; and rests only on the authority of decisions in lower branches of the court. See also, in this connection, Flint v. Woodin, 9 Hare, 618; Robinson v. Wall, 2 Phillips, 22 E. C. L. R. 372; Smith v. Clarke, 12 Ves. Jr. 476. The conflict between the rule laid down by the common-law and the chancery courts of England was finally settled by an act of Parliament, which provided that "whenever a sale by auction of land would be invalid at law by reason of the employment of a puffer, the same shall be deemed invalid in equity as well as at law."

In the case of Peck v. List, 23 W. Va. 338, s. c. 48 Am. Rep. 398, which is one of the leading American cases on the subject, the English decisions above referred to, as well as many others by the English common-law and chancery courts, are collected and commented on in the opinion of Mr. Justice Green. We have referred to such of those decisions as we deem necessary to the present discussion. The decision of Lord Mansfield must be treated as binding authority in this State, as there are none of our own decisions in conflict with the rule he there lays down. Attention was called in the argument to the fact that the record in the case of Locke v. Willingham, 99 Ga. 297, disclosed that certain charges of the trial judge bearing upon the subject under consideration in the present case were under review, and that the effect of the ruling in that case, which was merely a head-

note, that no error of law was committed, was to approve of the charges made by the trial judge. We have examined the record in that case, and we find that the charges of the judge under review were not only not in conflict with the rule laid down by Lord Mansfield, but seem to have been in accord therewith. The following decisions and authorities will show the rulings of some of the American courts on this subject: 2 Pom. Eq. Jur. § 934, pp. 1336-7; 3 Am. & Eng. Enc. L. (2d ed.) 504-5; Benj. Sales, (7th ed.) § 470 et seq.; 1 Warv. Vendors, 254; 1 Story's Eq. Jur. § 293; Bisp. Prin. Eq. § 209; Tied. Sales, §165; Rorer, Jud. Sales, 44; Bateman, Auctions, 131; 1 Wait's Ac. & Def. 482; Story, Sales, § 482; Veazie v. Williams, 49 U. S. 133; Flannery v. Jones, 36 Atl. Rep. (Pa.) 856; Bowman v. McClennan, 46 N. Y. Supp. 945; Pennock's App., 14 Pa. St. 446, s. c. 53 Am. Dec. 561; Hartwell v. Gurney, 13 Atl. Rep. (R. I.) 113; Reynolds v. Dechaums, 24 Tex. 174, s. c. 76 Am. Dec. 101; Davis v. Petway, 3 Head, 667, s. c. 75 Am. Dec. 789; Miller v. Baynard, 2 Houst. (Del.) 559; Jenkins v. Hogg, 2 Cons. Rep. (S. C.) 821; East v. Wood, 62 Ala. 313; Woods v. Hall, 1 Dev. Eq. (N. C.) 411; National Bank v. Sprague, 20 N. J. Eq. 159; Hinde v. Pendleton, Wythe's Rep. (Va.) 354; Curtis v. Aspinwall, 114 Mass. 187; Springer v. Kleinsorge, 83 Mo. 152; Towle v. Leavitt, 3 Fost. (N. H.) 360; Staines v. Shore, 16 Pa. St. 200.

An examination of the authorities above cited, as well as of many others which might be cited, will show that the conclusions reached by the American courts on this question are far from being uniform. Some have followed the rule laid down by Lord Mansfield; others the rule announced by Lord Loughborough; and still others are not in exact accord with either, but are modifications of one or the other. It is not possible to reconcile the American decisions on this subject, and it would not be profitable to undertake to do this, even if it were possible. We may lay it down as a rule without exception, that the employment of a puffer at an auction sale is such a fraud as will vitiate the sale. Such being the rule, the question now to be determined is, who is a puffer? Mr. Justice Green in Peck v. List, cited above, thus defines a puffer: "A puffer in the strict-

est meaning of the word is a person who, without having any intention to purchase, is employed by the vendor at an auction to raise the price by fictitious bids, thereby increasing competition among the bidders, while he himself is secured from risk by a secret understanding with the vendor, that he shall not be bound by his bids." This definition will be found to have been approved by several of the text-writers and many of the judges in the authorities and decisions above cited. It is directly in line with the ruling made by Lord Mansfield in Bexwell v. Christie. In order to constitute one who bids at a sale a puffer, it is not only necessary that he shall be employed by the owner of the property which is being sold, or by some person having an interest therein, but it must appear that the person employing the puffer was so interested in the auction or act of selling that there could be made with him a binding agreement by which the person bidding incurs not the slightest risk of being called on to comply with the terms of any bid that he may make. If he be employed by the owner of the property and the owner have complete control of the auction and the auctioneer, as was the case in Bexwell v. Christie, then no one would question that he was a puffer within the meaning of the law, and his employment would amount to a fraud upon the real bidder. If he be employed by a person interested in the property, although not the sole owner, and such person have complete control over the auction, so that he could entirely relieve him from all responsibility for the bid he would make, then a person employed under such circumstances would be a puffer within the principle of the ruling made in Bexwell v. Christie. The rule is thus stated by Mr. Justice Green in Peck v. List, before referred to: "But it is obviously unimportant whether the by-bidder is employed by the owner of the land or by some one having a pecuniary interest in the auction about to be made, and who stands in such relation to it that he can make good his assurance to the by-bidder, that he shall not be held responsible for his bid if it happen to be the highest bid made. The real essence of the fraud is not that the owner is bidding for the property, but it consists in the fact that a by-bidder pretending to be a bona fide bidder deceives honest bidders, raises the price of the property by fictitious bids in-

creasing competition, while he himself has good reason to believe and does believe that he is secure from any risk of being held personally liable for his bids. It is immaterial from whom he derives this assurance of immunity, provided the party giving the assurance expressly or impliedly has the power either legally or practically to make good the assurance. It makes no difference that such puffer or by-bidder was employed to prevent a sacrifice of the property and was directed to bid it to a fixed price only; nor does it make any difference that the property only sold at a reasonable price."

In many of the cases it is said that a person employed by the *owner* to secretly bid upon the property would be a puffer. In still others it is said that a person so employed by the *vendor* would be a puffer. In still others it is stated that a person so employed by the *seller* would be a puffer; and in still others it is declared that a person employed by those who are pecuniarily interested in the property would be a puffer. In dealing with this subject the terms, owner, vendor, seller, and person pecuniarily interested in the property or its proceeds, are to be given the same meaning, and they all refer to one who, without regard to what may be his peculiar interest in the property, must have absolute control of the auction sale and is at liberty of his own volition to discharge any bidder from liability on account of his bid. If the person conducting the sale can, notwithstanding the agreement of one who has a larger interest in the proceeds of the sale, hold the bidder responsible for the amount of his bid, then a person employed by the person having such larger interest in the proceeds would not be a puffer within the meaning of the law. Bidding by such a person would not be fraudulent, and therefore the sale would not be affected by the employment of such a person. An auctioneer is the agent of the person who directs him to make the sale. The sale is, therefore, controlled by one who directs the auctioneer. When an auction sale is declared by the auctioneer to be without reserve, this is, in effect, a statement that the person who directs the auctioneer to make the sale, no matter what his interest in the property may be, has empowered the auctioneer to sell the property to the highest bidder, and that the person directing the

auctioneer will not himself bid upon the property or employ others to do so in his behalf. Where the auctioneer puts up property without any statement as to the conditions of sale, the bidders have a right to presume that the sale is to be without reserve. The owner, vendor, seller, or person interested in the sale, whatever we may call him, that is, the person who has directed the auctioneer to sell the property and who will be compelled to make good to the bidder the acceptance of a bid by the auctioneer, is not allowed to secretly bid at the sale. He may bid, however, if public notice be given of the fact, so that other bidders may know that they are coming into competition with the person who has control of the sale. The mere fact that a person is pecuniarily interested in property which is being sold at auction does not preclude him from becoming a bidder; and this is true of judicial sales as well as private sales. No matter what interest a person may have in the proceeds of the sale or in the property which is going to be sold at public outcry, either at private auction or judicial sale, his right to become a bidder at the sale is well recognized by numerous decisions of this court as well as of other courts in this country, provided the sale is not under his control. See, in this connection, *Freeman* v. *Cooper*, 14 *Ga.* 238; *White* v. *Crew,* 16 *Ga.* 416; *Buckner* v. *Chambliss,* 30 *Ga.* 652; *Kilgo* v. *Castleberry,* 38 *Ga.* 512; Kearney *v.* Taylor, 56 U. S. 493; Richards *v.* Holmes, 59 U. S. 143; Pewabic Mining Co. *v.* Mason, 145 U. S. 349; Blossom *v.* Railroad Co., 70 U. S. 196; Smith *v.* Black, 115 U. S. 308; Allen *v.* Gillette, 127 U. S. 589; Baird *v.* Baird, 1 Dev. & B. Eq. 524, s. c. 31 Am. Dec. 399; Gulick *v.* Webb, 60 N. W. Rep. (Neb.) 13; Phippen *v.* Stickney, 3 Met. (Mass.) 384; Pa. Trans. Co.'s Appeal, 101 Pa. St. 576; Thames *v.* Miller, 2 Woods, 564; Twin Lick Oil Co. *v.* Marbury, 91 U. S. 587.

Such being the right of one who is interested in the property sold or in the proceeds of the sale, who is himself not conducting the sale and who has not such control over the sale as that he can make a binding agreement with a bidder that he will not be held responsible for his bid, it can not be a fraud for such person to employ one to bid at a sale in his behalf, even though the fact that the bidder is bidding in behalf of one interested in the

property is not disclosed to the other bidders.    The law charges
every one who attends an auction sale, no matter what its char-
acter, whether resulting from a private agreement or from a
judgment of a court, that any one interested in the proceeds of
the sale or in the property and who has no absolute control over
the sale may become a competitor with any other person at the
sale and bid for the property, and such a person is under no
obligation to disclose to others his intention to bid; and there-
fore the employment by such a person of another to bid in his
behalf, without disclosing that he is representing the person so
interested, could not in any sense be a fraud upon other bidders.
It is true that the law prohibits certain persons from acting as
agents of such a person.    A sheriff can not become a bidder at
his own sale as agent for another.    *Harrison* v. *McHenry,* 9 *Ga.*
164; *Coleman* v. *Maclean,* 101 *Ga.* 303.    Though it has been
held that a sheriff acting as auctioneer at an administrator's
sale may make one bid for a person interested in the property
to be sold, if he discloses the fact that he is bidding for another,
and if his authority is limited to making one bid and he have
no discretion to do otherwise.    *James* v. *Kelley,* 107 *Ga.* 446.

The matter may thus be summed up:    If a person who has
such control of an auction sale that he of his own volition can
release a bidder from all responsibility for his bid employs
another upon an understanding of that character to bid at the
sale without disclosing for whom he is bidding, for the purpose
of preventing the property from selling at a sacrifice or for the
purpose of making the same bring more than its actual value,
the bidding by one or more persons under such employment is
such a fraud upon the real bidders that the sale will be declared
void at their instance.    The only lawful way in which such a
person can prevent a sacrifice of the property sold is to fix a
minimum price, of which public notice shall be given, or make
public the fact that he, either by himself or by others, will be a
bidder at the sale.    On the other hand, the mere fact that the
person is interested in the property to be sold or in the proceeds
of the sale will not preclude him from either bidding himself
or from procuring another to bid, either openly or secretly, in
his behalf, without regard to what the agreement may be with

such bidder, if the one employing such bidder has not himself
such control of the sale that he could absolutely release the
bidder from all responsibility growing out of his having partici-
pated in the sale in that capacity. Applying the principles
above announced to the facts of the present case, Mr. Owens was
in no sense a puffer, and the sale was not for any reason set up
by the plaintiff in error invalid.

*Judgment affirmed. All the Justices concurring.*