IN RE OTIS M. GALLANT AND MARION J. HANNIGAN.—95 S. W. (2d) 1249.

St. Louis Court of Appeals. Opinion filed June 30, 1936.

WILLIAMS, S. C.—This is a disbarment proceeding, instituted on the 9th day of September, 1935, in the St. Louis Court of Appeals.

With leave of said Court Boyle G. Clark, John C. Grover, Grover C. Sibley, James A. Parks, J. D. James, and Morris E. Osburn, the duly appointed, qualified, and acting members of the Advisory Committee to the General Chairman of Bar Committees, sitting in lieu of the Bar Committee of the Tenth Judicial Circuit of Missouri, acting in their official capacity as such, filed in said Court an information against the respondents, Otis M. Gallant and Marion J. Hannigan, attorneys at law, duly licensed to practice law in this State, and members of the State Bar.

It is charged in the information that the respondents and each of them were guilty of professional misconduct in the following respects to-wit:

### COUNT ONE.

"That the accused Otis M. Gallant and Marion J. Hannigan, and each of them, from the year 1933, and continuously thence hitherto, within the territorial jurisdiction of the Tenth Judicial Circuit of Missouri, and other Judicial Circuits of the State of Missouri, have been, and are now, engaged in a conspiracy, combination, confederation and agreement to engage, and did and do now so engage, jointly and in association with each other, in the unprofessional and unethical practice of law and carry on a general law business in an unethical and unprofessional manner, pursuant to which said conspiracy, combination, confederation and agreement, and in conformity therewith, they, and each of them, within the jurisdiction aforesaid, between the dates aforesaid, became and were common barrators, in that they, and each of them, personally and through paid agents and runners, did solicit, incite, procure and induce many and divers persons to initiate and assert claims or file suits, or both suits and

claims, for damages for alleged personal injuries against their employers and former employers and to employ the accused, or one of them, to represent such claimants and litigants as attorneys at law in the presentation and prosecution of such claims; and that they agreed with such persons to pay the costs and expenses incident to the prosecution of said claims and suits and the costs and expenses of medical examinations; and in that they advanced money and benefits to the persons so engaging the accused, or either of them, as attorneys, which said employment the accused, or one of them, accepted and undertook; among which said persons so solicited, incited and procured by the means and in the manner aforesaid to assert claims and file suits were the following:

"(57 in number) . . .

"All of which said claims and suits the accused, or one of them, as attorneys for the respective claimants, have continued to urge and prosecute, and all of which said claims and suits as are not disposed of by settlement, judgment or dismissal, the accused, or one of them, now continue to urge and prosecute."

## Count Two.

"That the accused Otis M. Gallant and Marion J. Hannigan, and each of them, from the year 1933, and continuously thence hitherto, within the territorial jurisdiction of the Tenth Judicial Circuit of the State of Missouri and other judicial circuits of the State of Missouri, have been, and are now, engaged in a conspiracy, combination, confederation and agreement to engage, and did and do now so engage, jointly and in association with each other, in the unprofessional and unethical practice of law and carry on a general law business in an unethical and unprofessional manner, pursuant to which said conspiracy, combination, confederation and agreement, and in conformity therewith, they, and each of them, within the jurisdictions aforesaid, between the dates aforesaid, did unprofessionally, unethically and unlawfully procure, employ and use agents and runners, as a part of and in furtherance of their law business, and the law business of each of them, for the purpose of soliciting, enticing, inducing and persuading many and divers persons to employ them, or one of them, as their attorney or attorneys to initiate and assert claims and initiate and institute suits for and in behalf of such persons against many persons, firms and corporations, which said agents and runners the accused, and each of them, did agree to pay or reward, and which said agents and runners the accused, and each of them, did pay and reward, for the services so rendered by them as aforesaid, among which said agents and runners so employed and used by the accused, and each of them, were the following: James Bryant, L. A. Downs, John Duncan, Elzie Fletcher, Ben Foster, Sid-

ney Gallant, August Grove, Robert Guttman, W. J. Lewellyn Frank J. Novoson, E. W. Pickett, and Charles Saunders.''

COUNT THREE.

''That the accused Otis M. Gallant and Marion J. Hannigan, and each of them, from the year 1933, and continuously thence hitherto, within the territorial jurisdiction of the Tenth Judicial Circuit of Missouri, and other judicial circuits of the State of Missouri, have been, and are now, engaged in a conspiracy, combination, confederation and agreement to engage, and did and do now so engage, jointly and in association with each other, in the unprofessional and unethical practice of law and carry on a general law business in an unethical and unprofessional manner, pursuant to which said conspiracy, combination, confederation and agreement, and in conformity therewith, they, and each of them, within the jurisdictions aforesaid, between the dates aforesaid, did unprofessionally, unethically and unlawfully divide fees, and participate and aid in the division of fees which they, and each of them, received or expected to receive in the conduct of their law business with persons who were not lawyers or not licensed to practice law, among which such persons are the following: James Bryant, L. A. Downs, John Duncan, Elzie Fletcher, Ben Foster, Sidney Gallant, August Grove, Robert Guttman, W. J. Lewellyn, Frank J. Novoson, E. W. Pickett and Charles Saunders.''

The hearing of evidence was begun in the city of St. Louis on February 10, 1936, and was concluded on February 25, 1936. A transcript of the evidence taken at the hearing and reduced to narrative form by agreement was made by the reporter, which said transcript consists of 602 pages. The transcript was accompanied by photostatic copies of the numerous exhibits introduced by the informants and respondents. The transcript was completed and delivered to your commissioner and attorneys for informants and respondents on March 16, 1936. The transcript of the evidence, together with the photostatic copies of the exhibits introduced, are returned with this report.

The case was argued orally on April 25, 1936, and the parties were given twenty days within which to file written memoranda of authorities.

At the close of informants' case in chief respondents filed separate formal motions to counts Nos. 1, 2 and 3, of the information, requesting that the commissioner dismiss each of said counts for the reason that the charges contained therein were not sustained by the evidence. These motions were carried along with the case to its conclusion, and at the conclusion of all of the evidence said motions were by the respondents renewed. Count No. 3 charges that the respondents did unprofessionally, unethically, and unlawfully divide fees

with persons who were not lawyers and who were not licensed to practice law. There is no substantial evidence in the record to support this charge. Respondents' motion to dismiss as to count No. 3 should be sustained, and I so recommend.

Count No. 1 charges that the respondents and each of them were guilty of barratry in that they and each of them did unprofessionally and unethically, personally and through paid agents and runners, solicit, incite, procure and induce many persons to initiate and assert claims or file suits against their employers for damages for alleged personal injuries and to employ the accused to represent such claimants and litigants as attorneys at law in the presentation and prosecution of such claims and that they agreed to pay the costs and expenses incident thereto.

Count No. 2 charges that the respondents and each of them were guilty of unprofessional, unethical, and unlawful conduct in the practice of the law in that they and each of them did unprofessionally, unethically, and unlawfully procure, employ, and use paid agents and runners as a part of and in furtherance of their law business for the purpose of soliciting, enticing, inducing and persuading many persons to employ them as their attorneys to initiate and assert claims and suits for such persons. The evidence is ample to sustain the charges set forth in counts Nos. 1 and 2. Respondents' separate motions to dismiss as to said counts Nos. 1 and 2, should be overruled, and I so recommend.

The nature of the charges contained in counts Nos. 1 and 2 and the evidence relating thereto is so interwoven that it is difficult to separate the two counts for the purpose of discussion. For that reason and for the sake of brevity the evidence relating to counts Nos. 1 and 2 will be discussed together.

Respondents Otis M. Gallant and Marion J. Hannigan were partners engaged in the general practice of the law under the firm name of Gallant and Hannigan, with offices at 722 Chestnut Street, St. Louis, Missouri. Respondents have been associated together as partners for most of the time since 1929. The present partnership of Gallant and Hannigan was formed on April 1, 1933, and was continued until June, 1934. At that time, according to the statement of Mr. Hannigan, it was discontinued, with certain exceptions so far as new business was concerned, but was continued down to the date of the hearing insofar as the handling of old business was concerned.

Otis M. Gallant, who is 32 years old, is a graduate of the Department of Law of Washington University. The exact date on which he was admitted to practice in Missouri is not shown by the record. Marion J. Hannigan is 31 years old. He attended St. Louis University for three years, but did not receive a law degree. He was licensed to practice law in April, 1925. Otis M. Gallant was confined to a St.

Louis hospital during the hearing and did not testify. During part of the time mentioned in evidence Gallant was a resident of the city of Chicago, but he states in his deposition, which was introduced in evidence, that he accepted full responsibility as a partner for the conduct of the business of Gallant and Hannigan and that the business of the firm was carried on with his full knowledge and approval. The business of the firm consisted chiefly of personal injury claims, which for the most part were handled upon a contingent fee basis. The firm had in its employ Miss Ruth Uhl. She served during the entire period of the partnership as secretary and bookkeeper. She drew all checks and made all entries in the books of the firm, and, according to Mr. Hannigan, was the only one who was thoroughly familiar with the firm books.

In addition to Miss Uhl, six men, none of whom were licensed to practice law, were employed by the firm from time to time. At the beginning of the partnership, there were only three employed, Lawrence Jones, Sydney Gallant and Robert Guttman. Sydney Gallant continued with the firm until August, 1935; Robert Guttman, until December, 1935, and Lawrence Jones, until December, 1934. Frank Novoson was employed from October, 1933, to August, 1935. Roy Garrett was employed from January, 1934, to September, 1935, and one H. P. McCarthy was employed during the months of December, 1933, and January, 1934. These men were paid a weekly salary and all expenses by the firm. Sydney Gallant is a brother of respondent Otis M. Gallant. He received a salary of $40 per week and expenses. Robert Guttman received a salary of $40 per week and expenses during part of the time and $60 per week and expenses for the remainder of the time. Sydney Gallant and Robert Guttman were the most active of the employees of the firm. Payments made to the men employed by the firm were irregular in amounts and in frequency. No accurate account was kept as to each item of expense paid or as to what the various items of expense were. Sums paid to Robert Guttman were entered in four separate accounts, namely, "Robert Guttman Personal Account," "Information B" "Account Z" and "Chicago Account." The first three of these accounts were active at the same time. Mr. Hannigan testified that the accounts styled "Information B" and "Account Z" were kept for the purpose of keeping secret from the other employees of the firm, particularly Lawrence Jones, the total amount of money paid to Robert Guttman. The books of the firm disclosed another account styled "Information Expense." This account shows expenditures of $3847.60. These items of expense are not itemized, and there is no way to determine from the account what items of expense are included in this account. Mr. Hannigan testified that the only items of expense included in this account were such as were expended for entertainment, dinners, and drinks, and in promoting good will.

To sustain the charges set forth in counts Nos. 1 and 2 of the information, a number of witnesses were placed on the stand by the informants. The evidence for the most part relates to the solicitation of occupational disease cases arising from the breathing of dust. The evidence discloses that between February, 1934, and the middle of the following summer respondents were retained in about 190 occupational disease cases. The claimants were former employees of the Missouri Portland Cement Company, and most of them were residents of either Prospect Hill, just north of St. Louis, or Independence, just outside of Kansas City. The contracts of the claimants residing at Prospect Hill in most instances were obtained by Robert Guttman, and the contracts of the claimants residing at Independence were obtained by Sydney Gallant. Of the total number of contracts obtained, Guttman filled out approximately 105, and Sydney Gallant, 51. The contracts were printed on a card and were in the following form:

"CONTRACT OF EMPLOYMENT WITH
"O. M. Gallant & M. J. Hannigan
"Attorneys at Law

"_____           _____

"Plaintiff
"vs.

"_____

"Defendant
"I hereby employ O. M. GALLANT & M. J. HANNIGAN to represent me in a claim for damages on account of injuries suffered by me on _____ and I agree to pay them fifty per cent. of any amount recovered. If nothing is recovered they are not to receive anything for their services.

"_____"

Some of the contracts were not dated, and some were entirely blank except for the signature of the claimant. The methods employed by both Guttman and Sydney Gallant in securing the contracts were very similar. Guttman's efforts for the most part were confined to the former employees of the Missouri Portland Cement Company residing at Prospect Hill. Sometimes Guttman traveled alone; at other times he traveled in company with former employees of the Cement Company, particularly, with "Sonny Boy Robertson," a colored boy. After Guttman had been introduced, or had introduced himself, as the case might be, to the prospective claimant, he would ask him if he had ever worked for the Missouri Portland Cement Company. When informed by the prospect that he had, Guttman would ask him if he wanted to bring a suit against the company, and would suggest that, in view of the fact that the person with whom he was talking had worked at the Cement Plant, it was quite likely

that he had contracted a disease from the dust. In some instances he would show the prospective claimant a newspaper containing an account of the verdict for the sum of $25,000 obtained by Gallant and Hannigan in a dust disease case for one Otto Horachek. Guttman would suggest that he should employ Gallant and Hannigan and that the firm would take the case on a 50-50 basis and that the claimant would not be out any expense for medical examination or transportation in the event that there was nothing wrong with him.

The testimony of Allen Mann is typical of the method employed. Mann testified in substance as follows:

"Bob Guttman came to see me about my work at the Missouri Portland. I was in the house when he came, and he had some guy with him, this Sonny Boy Robertson I believe was his name. I had known Sonny Boy from the Hill there; Sonny Boy introduced this here Bob to me. I had not told him to bring him, and I did not know he was going to bring him. Bob mentioned getting judgment in Horachek case for $25,000.00. Q. What did he tell you about the Horachek case? A. Well, he told me, you know, about getting silicosis from that dust there, and probably a lot of us guys had it because we worked in dust. Bob Guttman said that. Q. Did you know you had it before he told you? A. He just told us we could get, you know, he wanted to sign us and give us 50-50 if there was anything wrong with us, I was supposed to get 50-50, and Gallant and Hannigan, I guess, got the other 50; I signed a contract on 'that basis. They were there about probably fifteen minutes. After they left, the next we done was get a letter to come down and be examined, which came from Gallant and Hannigan; I went down there. I believe I saw Mr. Hannigan. The Doctor examined me and took some X-rays. We didn't have to pay anything, that was paid when we got the settlement; $25.00 is what I think he charged, he never asked us to pay for it, and according to the way we understood we were not going to have to pay Meehan before we went there, wasn't supposed to pay anybody. I think Bob told us that when we was up there, said there wouldn't be any expense, if there wasn't anything wrong didn't cost anything, and if there was, we got 50-50."

During the early spring and summer of 1934, Guttman spent much time at Prospect Hill, insinuating himself into the friendship and confidence of many of the former employees of the Cement Company. He often played ball with the boys and associated with them at their loafing places. The evidence shows that on all such occasions Guttman carried with him a large number of printed contracts like the one set out above. When he approached some of the men, he advised them that the other boys were signing up and that they had just as well sign up too. The men approached usually said: "If the others are going to get some money, I had just as well get some too." The

evidence shows that the men approached had not sent for Guttman and did not know that he was coming. Some of them had never heard of the law firm of Gallant and Hannigan prior to the time they met Guttman and had not thought of making a claim or filing a suit against the company. Some of the witnesses stated that they did not know that they had grounds for a claim against the company until they were informed of the fact, and that they did not know whether or not they had sustained any injuries from working in the dust. The witnesses testified that Guttman did not say anything to them about testifying in any other case or that he was investigating other cases; that, after the contracts were signed, they later received a letter from Gallant and Hannigan asking them to come to their office; that they went down to the office and, after statements had been taken in the office, that they were sent to the doctor for examination. In most instances, the doctor took X-ray pictures and made blood tests. The men were never informed by the doctor as to the condition of their health. They paid nothing for the examination and did not receive a bill for it. The evidence shows that a large number of the men from whom contracts were obtained were never given a medical examination.

About the same time that Robert Guttman was at Prospect Hill, Sydney Gallant appeared in Independence, Missouri. He had with him a large number of printed contracts of Gallant and Hannigan like the one set out above. The method he employed in obtaining contracts in Independence was similar to that employed by Robert Guttman at Prospect Hill. On one of his several trips to Independence he encountered on the road a young man by the name of Charles Carter. He asked Carter if he would introduce him to some of the men who had formerly worked for the Missouri Portland Cement Company at Cement City near there. Carter took him to the home of a young friend named Bennie Gallop, a boy about 20 years old. Gallant told Gallop and Carter that he was seeking cases against the Missouri Portland Cement Company and asked them if they would introduce him to some of the men who had formerly worked for the company. He also told the boys that he would pay them for their time. However, Carter and Gallop testified that they did not receive any money either from Gallant or the firm of Gallant and Hannigan.

The boys spent some time introducing Gallant to men who were former employees of the company. Gallant told the men that he could get some money for them from the Missouri Portland Cement Company; that he represented Gallant and Hannigan, a law firm of St. Louis, Missouri; that they would take the case on a 50-50 basis; and that there would be no expense for transportation to St. Louis and a medical examination, if there were nothing wrong with them. Sydney Gallant also contacted, among others, Bob Mallison

and James Bryant who interviewed a number of men and took them to Sydney Gallant for the purpose of signing contracts. James Bryant was not in Independence at the time of the hearing and could not be located for the purpose of testifying as a witness. The witnesses testified that Gallant did not say anything to them about testifying in any other case or that he was investigating other cases. After the men in Independence had signed contracts some of them were brought to St. Louis for medical examination. X-rays were taken and blood tests made as in the case of the men from Prospect Hill. The men were never informed as to the condition of their health. They paid nothing for their transportation to St. Louis or for the medical examination. Their dinners in St. Louis were paid for by Sydney Gallant. Harley Inman, who furnished a car to bring some of the men to St. Louis for examination, was paid the sum of $10.

The evidence further shows that Noah Bohenberger was paid the sum of $17; Clarence Crego, $15; Earl Crego, $30; Ernest Elder, $15; Lester Edmonson, $17; John Henderson, $17; J. W. Johnson, $17; Elmer Hastings, $30; Wesley Griffith, $17; Joe LaRue, $17; W. J. Lindsay, $17; Lester McClain, $10; and Lee Powers, $15. Most of these men were from Independence and had claims against the Missouri Portland Cement Company. Mr. Hannigan testified that he did not know the purpose for which some of these amounts of money were advanced, but that in most instances the payments represented sums which were paid to the men when they came to St. Louis in destitute circumstances; that the money was used to pay for food, lodging, and transportation back to Independence; that the respective sums were charged to the men and that he expected to get it back out of any settlement that was made for them; and that, if no settlement were made, he expected the men to re-pay the sums so advanced. The record also shows a number of instances in which money was paid by respondents to their clients during the pendency of suits. Mr. Hannigan testified that these sums represented loans to destitute clients made after contracts of employment had been entered into.

After the contracts had been obtained, about 50 or 60 suits were filed against the company. No suits were filed except for claimants residing in or near St. Louis. In the fall of 1934, negotiations were begun, looking to a settlement of all the claims and suits which respondents were handling against the Missouri Portland Cement Company. After some preliminary negotiations the sum of $55,000 was tentatively agreed upon for the settlement of all of said claims and suits. In arriving at the tentative figure of $55,000 no consideration was given to the amount that each claimant was to receive, but the sum represented the amount which the company would pay in settlement of all the claims and suits. The company was not furnished with a list of the claimants at that time. After the tentative figure

of $55,000 had been agreed upon, respondents apportioned the amount among their respective clients in a manner that they regarded as fair, and they then conferred with some of their clients to see if they would be willing to settle for the sums which had been apportioned to them. When it was ascertained that the settlement could be made for this figure, it was definitely agreed upon. With the exception of a few instances most of the individual setttlements ranged from $450 down to $100.

Mr. Hannigan testified that at the time the settlement was made he did not know how many of the men had been examined by a doctor, but that he estimated that about 75 of them had actually been examined. Mr. Hannigan was unable to state the number of the claimants whom he had actually seen. He stated that he could not say whether or not he had actually met a majority of them. When the settlement was made, the claimants from St. Louis and vicinity received one-half of the amount for which their claims were settled, less a fee of $25 to cover medical examination. The claimants residing in Independence received one-half of the amount for which their claims were settled, less $40, which represented a fee of $25 for medical examination and $15 for expenses. About 175 claims were included in the first settlement. At the time this settlement was made respondents agreed with the Missouri Portland Cement Company not to handle any more claims against it.

At a later date a second settlement involving 90 additional claims against the company, was handled by the respondents with the consent of Mr. Rassieur, attorney for the company. Mr. Hannigan testified that the claims involved in the second settlement represented some 75 claims which had come to him through another lawyer and a few claims which had been overlooked in the first settlement. The name of the other lawyer was not disclosed. These claims were settled for a flat sum of $120 each. Of the 90 claims presented only 35 claims came within the terms of the settlement agreement and were actually paid.

At the conclusion of the second settlement respondents again agreed not to handle any more claims against the Missouri Portland Cement Company.

The record also discloses that in addition to soliciting occupational disease cases against the Missouri Portland Cement Company at Independence, that Sydney Gallant also solicited cases against the Universal Atlas Portland Cement Company from men residing in Hannibal, Missouri. The testimony of the witnesses from Hannibal shows that Sydney Gallant used the same methods in the solicitation of cases at Hannibal that he employed in Independence. The men approached were urged to file suits against the Universal Atlas Portland Cement Company. They were told that respondents would take their cases

on a 50-50 basis, and that there would be no expense to them for transportation to St. Louis and a medical examination. They testified that they signed contracts employing respondents to handle their claims. There is no showing that any claims for men residing in Hannibal, were ever presented by respondents to the company. The witnesses testified that they did not know what disposition, if any, had been made of their claims. The record does not disclose what became of these cases. Mr. Hannigan testified that his firm never at any time represented any one who had a claim against the Universal Atlas Portland Cement Company; that Sydney Gallant did not represent respondents in any solicitation of cases at Hannibal, Missouri, and that on three occasions he deducted a week's pay from Sydney Gallant's salary for the time he had spent in Hannibal. Respondents moved that the testimony of the witnesses from Hannibal be stricken for the reason that it was not shown that Sydney Gallant represented respondents while he was working in Hannibal, and that there was no showing that the respondents had anything to do with these cases. This motion, with the exception of the testimony of witnesses Johnson and Turner which was stricken at the time, was carried with the case to its conclusion.

The testimony shows that Sydney Gallant was in Hannibal on at least five different occasions, namely, April 1st, to April 4th, 1934; June 9th, to June 11th, 1934; June 17th, to June 27th, 1934; July 4th, to July 7th, 1934, and August 14th, to August 18th, 1934; on each of these occasions he was registered at the Mark Twain Hotel and the clerk testified that on such occasions men visited him in his room, particularly on one of his last trips "when possibly a hundred men came to see him during the day;" that the men who came to the hotel inquired for Sydney Gallant; that some of them were employed by the Universal Atlas Portland Cement Company and had with them letterheads or envelopes of Gallant and Hannigan. The testimony further shows that some of the men who signed contracts were afterwards brought to St. Louis for examination; that they went to the offices of Gallant and Hannigan and from there were sent to the doctor for examination. The doctor took X-ray pictures and made blood tests as in the cases of the men from Prospect Hill and Independence.

One of the witnesses, Everett Brandon, testified that on the day he was examined he talked to Mr. Hannigan in his office. This was denied by Mr. Hannigan. In corroboration of Mr. Hannigan's denial Attorney Wilbur Schwartz testified that he and Mr. Hannigan were engaged in the trial of a case on that day and that Mr. Hannigan was in the courtroom continuously from 10:00 A. M. to the noon recess at 1:00 P. M. and from 2:00 P. M. until 5:00 P. M. Mr. Hannigan's whereabouts during the noon recess of the court between 1:00 P. M. and 2:00 P. M. on this day, is not shown by the record.

Brandom also testified that he had written the firm of Gallant and Hannigan five letters relative to his claim; that each of these letters was addressed to the firm of Gallant and Hannigan at their St. Louis address; that he received replies to these letters, three of which he had preserved and were introduced in evidence. They are Informants' Exhibits Nos. 41, 42 and 43. Exhibit No. 42 was dated August 28th, 1934; it is on the stationery of Gallant and Hannigan; it is addressed to Everett C. Brandom, Hannibal, Missouri; it acknowledges receipt of a letter from Brandom under date of August 27th, and advises that "his claim is being properly taken care of." The letter is initialed "GH:RU" and is signed "Gallant and Hannigan" on the typewriter and also in script. Exhibit No. 43 is dated October 26th, 1934; it is on the stationery of Gallant & Hannigan; it is addressed to Everett C. Brandom, Hannibal, Missouri; it acknowledges receipt of a letter from Brandom of recent date and advises "that Mr. Gallant expects to visit Hannibal next month and before leaving here, of course, will communicate with you and the other men and arrange a time and place to meet." The letter is initialed "MJH:RU" and is signed "Gallant and Hannigan" on a typewriter by "M. J. Hannigan" in script.

From a comparison of the script signature of "Gallant and Hannigan" on Exhibit No. 42 and the script signature of "M. J. Hannigan" on Exhibit No. 43 with the admittedly genuine handwritting of Miss Ruth Uhl in the books of the firm which were introduced in evidence, there can be no question that each of said signatures is the handwriting of Miss Uhl. The initials on the letters indicate that they were dictated to and written by Miss Uhl. Miss Uhl, admittedly at the time, was the secretary of respondents. During the time covered by the Hannibal testimony Sydney Gallant was admittedly in the general employ of respondents. Neither Sydney Gallant nor Miss Uhl, who were present in St. Louis at the time of the hearing, and who were friendly to respondents, were called as witnesses to explain the activities of Gallant in Hannibal, Missouri, or the letters written in connection therewith. The mere fact alone that the record is silent as to what disposition was made of the claims of the men against the Universal Atlas Portland Cement Company is not conclusive in determining the admissibility of this testimony. I hold that this testimony, taken together with all the facts and circumstances surrounding it as shown by the record is sufficient to charge respondents with the acts and conduct of Sydney Gallant in Hannibal, and that the evidence was properly admitted. I therefore overrule respondents' motion to strike this testimony.

The evidence shows instances of solicitation of cases other than occupational disease cases.

William Munsey, of St. Louis, testified that he was injured when

struck by an automobile on April 20, 1933; that he was taken to a hospital; that, while he was in the hospital, Thomas Beck brought Robert Guttman and Lawrence Jones to see him; and that they wanted him to sign a contract employing Gallant & Hannigan to handle his case. He testified:

''I was injured in the head. I was dizzy at the time. I don't remember very much about it. They asked me to sign a paper and I signed it. Mr. Guttman told me at the time I signed the paper that they would keep me up while I was waiting for the case to come up. After I left the hospital, Mr. Otis M. Gallant, in company with Mr. Jones, came to see me. After I got up, I went to the office of Gallant and Hannigan about once a week, and I received $5.00 a week from then until I settled. At the time Guttman and Jones came to the hospital I had not talked to any one about getting a lawyer and had not sent for a lawyer.''

Thomas Beck testified that he was living in the same house with William Munsey at the time Munsey was injured. The next day after Mr. Munsey was hurt Guttman and Jones came to the rooming house where he was staying. They asked him if he were a friend of Munseys and if he would go to the hospital with them to see Mr. Munsey. They told him they would give him $10 if he would go to the hospital and get Mr. Munsey to sign a contract. He testified that he accompanied Guttman and Jones to the hospital and, that after they had talked to Mr. Munsey, he signed a contract employing Gallant & Hannigan. Later that day Mr. Otis M. Gallant gave him a check for $10. The check endorsed by Beck was introduced in evidence and was charged to Munsey at the time his case was settled.

Thomas Beck was corroborated by his wife, Gail Beck, who was present at the time Guttman and Jones talked to him in the rooming house. He was corroborated also by Mrs. Geneva Aman, who ran the rooming house where Munsey and Beck stayed.

Raymond McKinney testified that he was injured in a street car accident; that after he returned from the hospital about five days after the accident that Sydney Gallant called at his home one evening; that Gallant had previously called at the hospital, but that he was not able to talk to him; that Sydney Gallant wanted him to sign a contract employing Gallant & Hannigan to represent him; that he did not sign at that time, but that Sydney Gallant came back the next morning. He said:

''Now, Mr. McKinney, you have a wife and two children, if you will give me this contract I will pay you $20.00 a week for the time you are off, to defray your living expenses, and we are sure you will get six or eight thousand from the Street Car Company.''

McKinney further testified:

''On this representation I signed the contract, my wife signed it,

too. He told me to come to the office the next morning and get the first $20.00 payment. I went down to the office; Sydney Gallant was not there. I saw Mr. Hannigan and Otis M. Gallant, I talked to Mr. Otis Gallant. He said he could not see his way clear to pay me $20.00 a week. I never received the payment of $20.00 a week.''

Later McKinney became dissatisfied and settled his case with the street car company without the knowledge of Gallant & Hannigan. Raymond McKinney was corroborated on all material points by his wife, Martha McKinney.

Several witnesses were placed on the stand by respondents who testified to conversations which they had had with certain of informants' witnesses relative to filing a claim against the Missouri Portland Cement Company.

Abbey Chestnut testified that he lived on Prospect Hill; that Paul Wiesner talked to him about filing a case against the Cement Company; that when Wiesner said that he had employed the firm of Gallant & Hannigan, he requested Wiesner to have Gallant & Hannigan call on him; that he talked to Allen Mann about filing a case against the company and that Mann requested him to send his lawyers to him. Chestnut further testified that he signed his contract at the office of Gallant & Hannigan and that he talked to Mann a few days later. However, the contracts of Chestnut and Mann introduced in evidenced were both dated March 1st, 1934.

Harold Reid testified that he lived in Baden; that Paul Wiesner talked to him about filing a case against the Cement Company; that he said to Wiesner:

''Well, if the rest of the boys get money out of the Cement Company I figure I ought to have some too, and Paul introduced me to Bob Guttman. Later, on a Sunday, Guttman called at my home with Paul Wiesner. He talked to me about my case and I introduced him to my brother Eugene Reid and Lester Tharp. I asked the boys why they didn't let Bob and Mr. Hannigan handle their cases.''

Harold Reid further testified that he did not sign a contract at that time; that he signed his contract at a later date at the offices of Gallant & Hannigan. However, the contracts of Harold Reid, Eugene Reid and Lester Tharp, which were introduced in evidence, were all dated March 11, 1934, which was on Sunday.

S. C. Chapman testified that he resided in Independence and had formerly practiced law; that he was not licensed to practice in Missouri; that he did some notary work for Gallant & Hannigan in connection with some releases; that Jim Parsons had told him that he wanted to file a suit against the Cement Company and had asked him to send Sydney Gallant to him. He further testified that this was in the early part of the summer of 1934. He testified on cross-examination that the first time he had met Sydney Gallant was when he was doing

some notary work on some releases in the latter part of 1934, several months after Parsons' contract had been signed.

Robert Mallison of Sugar Creek testified that he was 24 years old; that Gallant & Hannigan handled a claim for him against the Missouri Portland Cement Company; that he talked to George Atchley, Thomas Roundtree, Harley Inman, Noah Bohenberger, and Lester Edmonson about filing claims against the Cement Company and that each of them told him that if he saw Sydney Gallant again to have him come to see them; that he talked to these men before he ever met Sydney Gallant; that his claim against the company was never settled; that he came to St. Louis at Mr. Hannigan's request and that the expenses of the trip were paid by Mr. Hannigan; that he promised to give him a day's wages for coming, and that he had received no other money from Gallant & Hannigan.

Sam Guttman, father of Robert Guttman, testified that he was present at the scene of the accident when William Munsey was injured; that he helped Mr. Munsey and told him that he had a son who was connected with some lawyers and that his son "could do him some good;" that Mr. Munsey requested him to have his son call on him and that he told his son of Mr. Munsey's request.

James Egan testified that he was Raymond McKinney's boss at the time he was injured in the street car accident; that on Monday morning following the accident Mrs. McKinney called him by phone and told him that her husband had been injured and could not report for work and requested him to go to see her husband and get a lawyer for him; that after this conversation with Mrs. McKinney he got in touch with respondent Hannigan and requested him to call on McKinney.

A number of statements signed by several of informants' witnesses who had testified that their contracts were solicited were produced by respondents. These statements were obtained by Robert Guttman a short time before the hearing. Most of the men were from Independence, and the statements were similar in form. Some stated that they had asked Jim Bryant and others that they had asked Bob Mallison to bring Mr. Gallant around; that they had received certain sums of money in the settlement of their claims; that they were not satisfied and thought that they should have received larger sums. These statements were repudiated by the witnesses. The witnesses testified that the statements were dictated by Mr. Guttman and that the language was his rather than that of the witnesses. The statements are in the general form used by those accustomed to preparing statements. The witnesses from whom the statements were obtained were uneducated and unaccustomed to writing statements, and it is hardly conceivable that these statements written as they were by the men separately and at different times could have been so similar in form and substance had they been in their own words. Each of

the statements contained a phrase to the effect that the witness was not satisfied with the amount he had received on the settlement of his case and that he thought he should have received a greater sum. The amounts indicated in the statements ranged from $1000 to $2000. Some of the witnesses testified that these amounts were suggested by Mr. Guttman and that they took it "that he was trying to help us boys to get some more money."

The foregoing evidence shows conclusively that respondents employed paid agents and runners, which said agents and runners solicited, incited, procured, and induced persons who might have lawsuits to employ respondents to represent them. The facts and circumstances shown by the record discloses a well defined scheme for the solicitation of cases on a rather large scale. The firm had in its employ a number of men who were not lawyers. At least two of these men, Robert Guttman and Sydney Gallant, as the record discloses, spent much of their time in the solicitation of cases for respondents. The contracts obtained by them were accepted and acted upon by respondents. It is admitted that these men were paid a salary and all expenses by respondents. They were supplied by the firm with printed contracts of employment in blank form, and thus armed they went out in search of those who might have a claim of some kind for damages. The evidence further shows that many of those solicited had no thought of bringing a lawsuit until it was suggested to them by Guttman or Sydney Gallant, and that Guttman and Sydney Gallant represented to those solicited by way of inducement for signing the contracts that they would not be out any expense for transportation or medical examination, if no recovery were obtained, and in some instances they represented that the claimant would be supported by respondents during the time his case was pending. The record discloses that in many instances these representations were actually carried out by respondents.

It was unprofessional, unethical, and unlawful for respondents to employ paid agents and runners to go out and find persons and suggest to them that they should file claims or bring lawsuits and to suggest and urge that they employ respondents for that purpose. I am not unmindful of the fact that it has been held legal for a lawyer to hire paid investigators who are not lawyers, but no case has been called to my attention, and I have not been able to find any, which would extend the rule to include persons hired for the purpose of soliciting cases. Certainly what a lawyer cannot legally do himself, he cannot do through the medium of a paid agent or runner.

Respondents arranged for the medical examination for a number of the claimants and thereby became obligated for the payment of the fees for such an examination. In addition to this the expenses of transporting some of the men to and from St. Louis for medical

examination were paid by respondents. The record discloses that most of these men at the time these obligations were contracted and the money for transportation expenses was advanced were either unemployed or were working on government supported projects, which did not provide an income beyond their bare necessities. This being true, respondents must have known at the time these obligations were contracted and the money advanced that it could not be repaid unless they were successful in obtaining a settlement for the men. This goes beyond the rule of law which permits an attorney to make advancements to a destitute client for his support after a legitimate contract of employment has been entered into. That such a practice is vicious and should be condemned in the interest of public welfare and the orderly administration of justice is self evident. The fact that neither Sydney Gallant, who was present during the early part of the hearing, nor Robert Guttman, who was present and active throughout the hearing, were called as witnesses to explain their activities or how the contracts were obtained is rather significant to say the least. This is also true of the fact that Miss Ruth Uhl, who was still in the employ of the firm as secretary and bookkeeper and who, according to Mr. Hannigan's own statement was the only person who was thoroughly familiar with the books of the firm, was not called as a witness to explain the various accounts and the items of expense contained therein.

It therefore follows that under the evidence respondents are guilty as charged in counts Nos. 1 and 2 of the information filed herein.

The testimony of respondent Hannigan taken before the Bar Committee, together with the exhibits identified in connection therewith, were introduced in evidence, being Informants' Exhibit No. 28. It was called to my attention by respondents at the oral argument that the reporter had inadvertently included in Exhibit No. 28 the testimony of certain other witnesses who appeared before the Bar Committee. The testimony of such witnesses was improperly included and is stricken out.

### FINDINGS OF FACT.

#### I.

I find from the evidence that respondents Otis M. Gallant and Marion J. Hannigan, and each of them, are guilty as charged in counts Nos. 1 and 2 of the information filed herein.

#### II.

I find from the evidence that respondents Otis M. Gallant and Marion J. Hannigan, and each of them, are not guilty as charged in count No. 3 of the information filed here.

### CONCLUSIONS OF LAW.

#### I.

I find as a matter of law, on the facts as found herein, that it was un-

professional, unethical and unlawful for respondents, through paid agents and runners, to solicit, incite, procure and induce persons to ascertain claims or file lawsuits and to urge such persons to employ respondents to represent them.

## II.

I find as a matter of law, on the facts as found herein, that it was unprofessional, unethical and unlawful for respondents, to employ and use paid agents and runners as a part of and in furtherance of their law business, for the purpose of soliciting, enticing, inducing and persuading persons to employ respondents as their attorneys to initiate and assert claims and suits for them.

## III.

I hold as a matter of law that, under the information filed in this case, evidence of similar transactions to those charged in the information was competent and admissible in evidence; because it tends to establish the concerted plan or manner of respondents in the conduct of their law business. [Hobbs v. Boatright, 195 Mo. 693, l. c. 727.]

## IV.

I find as a matter of law that neither this proceeding, nor the rules of the Supreme Court under which it is brought, are violative of the due process clause of the Constitution of the United States, and also that they are not violative of section 15, of article II and section 12, of Article XIX of the Constitution of Missouri, prohibiting the enactment of *ex post facto* laws and laws retroactive in their operation. [In re Sparrow, 90 S. W. (2d) 401.]

### RECOMMENDATIONS.

## I.

I recommend that the court enter a judgment finding respondents Otis M. Gallant and Marion J. Hannigan, and each of them, guilty as charged in counts Nos. 1 and 2 of the information, and that they and each of them be suspended from the practice of the law in the State of Missouri, for a term of one year.

## II.

I recommend that the court enter a judgment finding respondents Otis M. Gallant and Marion J. Hannigan not guilty as charged in count No. 3 of the information, and that said count be dismissed.

Dated this 19th day of June, 1936.

PER CURIAM:—The foregoing report, finding of facts and conclusions of law of Special Commissioner Honorable DERWOOD E. WILLIAMS, are adopted as the opinion of this court. The order and judgment of the court is therefore that the licenses of the respondents, Otis M. Gallant and Marion J. Hannigan, and each of them, to practice law in the State of Missouri are hereby suspended

for a period of one year from this date and until the payment of the costs of this proceedings. *Hostetter, P. J.*, and *Becker* and *Mc-Cullen, JJ.*, all concur.