CHARLES C. CURRY, Appellant, v. B. G. DAHLBERG.—110 S. W. (2d) 742.*

Court en Banc, December 9, 1937.

---

*NOTE: Opinion on Motion for Rehearing reported in 112 S. W. (2d) 345.

898

*Burnett, Stern & Liberman, Samuel H. Liberman* and *Robert L. Aronson* for appellant.

*Ewing, Ewing & Ewing* for respondent.

HYDE, C.—This case, coming recently to the writer, is an action to recover certain amounts alleged to be due plaintiff under a contract made in July, 1914. Suit was commenced in 1918. The amount alleged to be due plaintiff, under the facts stated in the

second count of his fourth amended petition is $43,529.77. In other counts, it was alleged that other and additional amounts were due plaintiff but that an accounting was necessary to determine these amounts and the total sum due from defendant to plaintiff. The court sustained a demurrer to all counts except the second, and upon trial on the second count, before the court without a jury, finding and judgment was for defendant. Plaintiff has appealed from this judgment.

One phase of this case was before this court in Dahlberg v. Fisse, 328 Mo. 213, 40 S. W. (2d) 606. The second count of the petition upon which the case was tried contained substantially all of the allegations set out in Dahlberg v. Fisse. Because of the view we take, it is not necessary to rule the assignments on the demurrers, so we will not state the allegations made in other counts. Plaintiff was engaged in the lumber business. He had started to work in that business when he was sixteen years old and, in 1914, had been engaged in that business for about thirty years. He was not a lawyer. Defendant was described as a commerce expert or rate expert, "and as such had formed .an organization for the acquisition of contracts for refunds exacted in violation of the maximum freight rate acts of Missouri of 1905 and 1907." [See State ex rel. Barker v. Chicago & Alton Railroad Co., 265 Mo. 646, 178 S. W. 129; White v. Delano, 270 Mo. 16, 191 S. W. 1012; State of Missouri v. C., B. & Q. Railroad Co., 241 U. S. 533, 36 Sup. Ct. 715, 60 L. Ed. 1148; Missouri Rate Cases (Knott v. C., B. & Q. Railroad Co.), 230 U. S. 474, 33 Sup. Ct. 975, 57 L. Ed. 1571.] In July, 1914, defendant had eight solicitors in Missouri who were seeking to persuade shippers in Missouri to turn over their claims for freight overcharges to defendant for collection. Defendant was not a lawyer but *signed the claimants' names, to petitions and claims filed in court, "by B. G. Dahlberg as agent for the petitioners,"* and had them presented by lawyers employed by him.

Contracts made between such shippers and defendant usually contained the following provisions:

"In consideration of your furnishing to me freight bills, and/or other necessary data, covering shipments made by you, or on your account, during the last nine years, on which the freight charges have been paid by you, or on your account, I agree to audit the same. If overcharges of any kind exist (including overcharges by virtue of the so-called Missouri Rate Case), on which recovery may be had, *I will file claims and diligently prosecute same for your* account and in your name, the vouchers to be drawn payable to your order in my care.

"In consideration of my services *you agree to pay me fifty per cent of all amounts recovered,* as soon as vouchers therefor have

been received by you, which shall be my only compensation for my services.

"It is further understood and agreed that if this offer is accepted, you will turn over to me all freight bills covering all shipments for said nine year period, to be handled as aforesaid; that where all freight bills are not available, you will furnish me such other data as I may request, including car numbers, dates of shipments, etc., together with the names of consignees; and that you hereby give me authority to take up with the several consignees for the surrender of said freight bills, or such other data as they may be able to furnish, said freight bills and said information to be used for your account, in accordance with the conditions of this contract.

"It is further understood and agreed that *I am to have exclusive control of the handling of the overcharges covered by this contract.*"

The circumstances of plaintiff's relations with defendant, and the terms of the contract sued on, are stated in plaintiff's brief, as follows:

"An agent of defendant named Shaw called upon plaintiff to solicit any claims plaintiff might have for recovery of excessive charges from the railroads. Plaintiff had no such claims, but was interested in the situation as the result of Mr. Shaw's explanation thereof, and expressed the thought that he might help defendant. As a result plaintiff and defendant met in St. Louis on July 2, 1914. At that meeting they reached an informal agreement, of which the plaintiff made some pencil notations. Defendant took this penciled memorandum to St. Paul with him and there prepared a letter which came to constitute the contract between the parties. . . . It is as follows:

" 'Office of B. G. Dahlberg
" '*Commerce Expert*
" '1601-2-3-4 Pioneer Building
" 'St. Paul, Minn.

" 'July 9, 1914

" ' (Personal) .
" 'Mr. Chas. C. Curry,
" 'Wright Bldg.,
" 'St. Louis, Mo.
" 'Dear Mr. Curry:
" 'This will confirm arrangements made with you in St. Louis last week as follows:
" 'On all contracts for handling of refunds under the Missouri State rate case which you secure for me or assist me to secure, *I will pay you the following proportion of my gross compensation* in connection with such contracts:
" '*20% in case it is not necessary to go to trial in court; 15% in*

*case claims are settled after court trial,* but before the cases come to trial before the Supreme Court of the United States; *10% if the cases go to trial in the United States Supreme Court.* These payments are to be made to you immediately I secure payment of my proportion from the clients.

" 'All contracts to be taken subject to my individual approval, and *no contracts to be negotiated where my gross proportion is to be less than 50% without my previous approval,* except the following firms with whom you may negotiate on basis 25% of the principal and 50% of any interest recovered: (Eleven firms listed.)

" 'This memo will cover all contracts secured by you or by me covering lumber, poles, posts and ties not already signed for my account, except

" 'Gideon Anderson Lumber Co.

" 'Any contract secured for me by the Hardwood Dealer's Association.

" 'It is understood that this agreement is to be in force and effect during such time as you actively engage in the proposition. If, for any reason, you discontinue the work, then this agreement is canceled and will only apply and be construed to apply to such contracts as may have been secured under this agreement during the period it is in force.

" 'It is the sense of this agreement, and it is specifically agreed that we will mutually render each other all assistance possible for the successful prosecution of the work covered hereby.

" 'Any expenses in connection with this work incurred by you are, of course, to be paid by you, except that where necessary to draw off from the shippers' books information upon which to bring and prosecute claims, *I will have my auditors do this work.*

" 'It is understood that this forms a special partnership between us for the handling of the particular matters referred to in this memo, subject to the conditions and terms contained in this memo; it being further understood that no liability will be assumed by me for any disbursements made by you, or liabilities which may be contracted by you. I am to be kept fully informed of the progress of the work, and to receive prompt report of all contracts and negotiations made. (Signed) B. G. Dahlberg.

Memo:

" 'The above is agreed to and accepted by me this 13th day of July, 1914.

" ' '(Signed) Chas. C. Curry.'

"At his own expense, plaintiff interviewed persons, firms and companies which might possibly have claims against the railroads for overcharges. By correspondence he contacted innumerable shippers. *His activities extended over a period of more than two years.* From

time to time contracts with shippers of lumber, posts, poles and ties were obtained. All contracts were taken in the name of defendant. Some were obtained by plaintiff or with his assistance, and some were obtained otherwise. The claims thus obtained were not directed against any one railroad alone, but went against all railroads which had done intrastate business in Missouri. One of the railroads against which a considerable volume of the claims were directed was the Frisco Railroad. Said road was in receivership at the time of the contract between the present parties.''

Defendant's activities with regard to the Frisco claims are described in an agreed statement of facts, as follows:

"On May 26, 1913, the Frisco Railway Company went into the hands of a receiver and was thereafter administered by Circuit Judge Sanborn in the United States District Court of the Eastern Division of Missouri. Time for filing intervening petitions had expired. The *defendant filed an application in that court to file intervening petitions* for each Frisco claimant he had. Judge Sanborn would not grant leave to file and referred the application to Special Master Fauntleroy. There was a hearing before the Special Master, and he filed a report recommending that leave be granted to file the intervening petitions. Each petition was filed. A motion in each intervention was filed by the Receiver to make the petition more specific. These motions were argued and briefed before the Master and overruled. The Receiver filed answers in each. Each intervenor filed a motion to strik out. They were overruled. The interventions were consolidated for the purpose of a hearing thereon by the Special Master. A hearing occupying days was had. Pending the hearing Judge Sanborn had a hearing on the propriety of the Plan or reorganization. These intervenors were represented at that hearing. Judge Sanborn overruled their protests and objections, and these and other intervenors appealed to the Circuit Court of Appeals for the Eighth Circuit. Before the case of Houck v. Frisco, No. 4805, was reached for hearing in that Court Special Master Fauntleroy entered an interlocutory order for an accounting in each intervention. Thereafter a settlement was had of all the intervening claims in the Frisco receivership, as appears from Exhibit A to the first amended petition in this cause. [See Dahlberg v. Fisse, supra.] On October 5, 1917, the committee of intervenors received the proceeds of such settlement.'' Defendant was a member of this committee.)

The application to file intervening petitions in the Frisco case had the following affidavit attached:

"B. G. Dahlberg being first duly sworn deposes and says that he is the agent of your petitioners herein, and on behalf of your petitioners makes oath and says that the facts stated in the above and

foregoing petition are true to the best of his knowledge, information and belief.

"B. G. Dahlberg

"Subscribed and sworn to
before me this 29th day of
November 1915, *Roy J. Mordaunt*
"Notary Public Ramsey County, Minn."

This application was filed on behalf of more than 200 claimants, all of whose names are signed thereto "by B. G. Dahlberg their agent." Other papers in the case are signed in the same manner. These claims ranged in amount from about $100 to as much as $50,000. Many of them were for more than $1000. After this suit was commenced, plaintiff assigned his interest in his contract to two banks as collateral security for his indebtedness to them. He was also thereafter adjudged a bankrupt and his bankruptcy case has been kept open pending the result of this case.

Other activities of defendant under contracts procured by him, or by plaintiff for him, are related in the agreed statement of facts, as follows:

"*Defendant employed counsel* to appear in the case of State of Missouri v. C. & A. Railroad Co., reported in 265 Mo. 656, and *also employed counsel to prosecute the claim of White v. Delano,* Receiver of the Wabash, reported in the 270 Mo. 16. *Defendant also employed counsel to appear in the Supreme Court of the United States* in the case of State of Missouri against Burlington Railroad Co., decided May, 1916, and reported in 241 U. S. 533, 16 L. Ed. 1148.

"In the Missouri Pacific and Iron Mountain receivership in the reorganization of said roads, the *defendant employed counsel to appeal* and protect the confirmation of the sale of said roads by all the intervenors in said receiverships. Judge Hook of the Circuit Court overruled said protest and *defendant employed counsel to appeal the case,* which was reported in the 280 Fed. 38. That Court affirmed the decision of Judge Hook and at the instance of defendant an application for a writ of certiorari was applied for and denied by the Supreme Court of the United States in the case reported in the 260 U. S. 743, 67 L. Ed. 491.

"In the Wabash receivership there was tried before the Special Master the case of Koenig v. Wabash and the Special Master filed a report recommending that the intervening petitions be dismissed because the Maximum Freight Rate Acts of Missouri of 1905 and 1907 were discriminatory. That case was heard on exceptions by Judge Sanborn, who sustained the exceptions. Thereupon the Wabash Railroad appealed the case to the Circuit Court of Appeals, which affirmed the judgment below, reported in 274 Fed. 909. The

Wabash Railroad applied to the United States Supreme Court for certiorari, which was denied, 257 U. S. 600.

"The intervenors in the Wabash filed answer to the application of the Equitable Trust Co. of New York for a deficiency judgment and *were represented by attorneys employed by the defendant,* on appeal to the Eighth Circuit Court of Appeals, which affirmed the judgment below. Efforts were made by the intervenors to have the case reviewed by the Supreme Court of the United States, but that Court refused to issue a writ of certiorari.

"The *intervenors, represented by the defendant,* attempted in the Wabash receivership to uncover assets. The matter was referred to Special Master Babbitt, who had hearings on the same and arguments thereon. He made a report to which the intervenors presented their exceptions to Judge Sanborn at St. Paul, who sustained some exceptions and overruled others. Both parties appealed the case, Nos. 6156 and 6157. Settlements were made in the Wabash receivership before those cases were reached on the docket."

These facts, not only appear from evidence and by stipulations but are fully stated in plaintiff's fourth amended petition. In addition to setting out the terms of the contract sued on and describing the activities of both plaintiff and defendant, the first count of this petition states:

"On and prior to July 9, 1914, plaintiff was and for a long time prior thereto had been engaged in the business of buying and selling lumber, posts, poles and ties. . . . On July 9, 1914, and prior thereto, the defendant *was by vocation a commerce expert* and was engaged chiefly in the work of attempting to obtain from railroads, on behalf of shippers, of various and numerous commodities, refunds for overcharges unlawfully exacted by said railroads from said shippers, and the defendant's method of operation was to obtain contracts from said shippers whereby defendant would agree *to undertake the collection of overcharges* on behalf of said shippers *at his own expense for a contingent consideration* based upon a stipulated percentage or percentages of the amounts recovered from the railroads in behalf of such shippers for whom defendant made claims against the railroads." (This is repeated or incorporated by reference in all other counts.)

Defendant filed an equitable counterclaim seeking to reform the contract sued on. This is described in defendant's brief, as follows:

"Appellant knew at the time he drew this contract that the claims were being filed in the United States District Court of St. Louis, Missouri. He didn't know and could not know where appeals taken from that court would go, and hence, he inserted 'the Supreme Court of the United States' as the next tribunal that would handle the matter after the trial in the District Court. No reasonable person

would have made any such contract; but they would have made the contract read: 'In case the claims are settled after court trial but before the cases are tried in an appellate court, a certain percentage should be allowed, and if they go to trial in the appellate court, a different percentage should be allowed.'" (Perhaps this might be said to be a mutual mistake on the ground that, since neither party to this contract was a lawyer, they would not know that Circuit Courts of Appeals existed?)

█ When it clearly appears from the record proper that a plaintiff is not entitled to any relief whatever, an appellate court is justified, if in fact it is not its duty, to so declare even though it must raise the decisive question *sua sponte* and the result would be a reversal. [See Massey-Harris Harvester Co. v. Federal Reserve Bank, 226 Mo. App. 916, 48 S. W. (2d) 158; Greer v. St. L., I. M. & S. Ry. Co., 173 Mo. App. 276, 158 S. W. 740; Secs. 1062-1063, R. S. 1929; 4 C. J. S., secs. 1239-1368; 3 Am. Jur., secs. 250-251, and 295.] Certainly this court should raise the question where a vitally important matter of public policy is involved, and examination of the bill of exceptions conclusively shows that the judgment rendered by the trial court reached the correct result and should be affirmed. █ Defendant, a layman, was undertaking to engage in the practice of law in this State. [Clark v. Austin, 340 Mo. 467, 101 S. W. (2d) 977; State ex inf. Miller v. St. Louis Union Trust Co., 335 Mo. 845, 74 S. W. (2d) 348.] Denominating himself as a "commerce expert" or a "rate expert" or by any other high sounding designation does not change this obvious fact. Plaintiff, a layman, by this action seeks to obtain compensation for soliciting persons throughout this State to employ to defendant to transact legal business and conduct litigation in their behalf, both in the courts of this State and in the Federal courts. This court has adopted a code of ethics for lawyers. Rule 35, Cannon 28, states that "it is disreputable . . . to breed litigation by seeking out those with . . . grounds of action in order to secure them as clients, or to employ agents or runners for like purposes, or to pay or reward, directly or indirectly, those who bring or influence the bringing of such cases to his office." This court has appointed committees of lawyers in every judicial circuit, with a general chairman and an advisory committee to act anywhere in this State, charged to investigate and act on "any matter of professional misconduct." That this cannon of ethics is being enforced may be seen from the following cases. [In re Noell (Mo. App.), 96 S. W. (2d) 213; In re Gallant (Mo. App.), 95 S. W. (2d) 1249; In re Tall, 339 Mo. 11, 93 S. W. (2d) 922; In re Sparrow, 338 Mo. 203, 90 S. W. (2d) 401; In re H—— S——, 229 Mo. App. 44, 69 S. W. (2d) 325.] These committees are also charged to "make inquiry from time to time as to the unlawful

practice of law by persons not licensed to do so, and where . . . the facts justify it, to instigate and prosecute . . . such actions as may be appropriate to suppress such unlawful practice," and such action has been taken. [Clark v. Austin, 340 Mo. 467, 101 S. W. (2d) 977; State ex inf. Roy McKittrick, Attorney General, v. C. S. Dudley & Co., 340 Mo. 852, 102 S. W. (2d) 895; Clark v. Reardon (K. C. Court of App.), No. 18725, decided at March Term, 1937, not yet reported; see Supreme Court Rule No. 36.]

 This court has thus exercised its inherent powers in recognition of its responsibility (as head of the Judicial Department of the State Government with "general superintending control over all inferior courts," Sec. 3, Art. 6, Constitution) to the public for the proper administration of justice. If courts are to reach correct results without denial, delay, or miscarriage of justice, cases must be prepared and presented by practitioners who have had thorough legal training, who are known to be of good moral character, and who recognize their duty as officers of the court to conduct themselves in accordance with ethical standards established through long experience as necessary in the public interest. [In re Richards, 333 Mo. 907, 63 S. W. (2d) 672.] To protect the public from ignorance and dishonesty, lawyers, who do not have sufficiently adequate preparation to be properly fitted to represent others or who do not recognize the high character of their public duty, cannot be permitted to continue to transact legal business, nor can unethical competition for legal business be permitted from any source. This court has refused to set idly by with its eyes closed and its ears covered "to see no evil and to hear no evil" in the conduct of "officers of the court." Having acted as above stated, when action seemed necessary, it cannot now consistently enforce a contract like the one involved herein. To do so would be a denial of the position it has taken and would directly contradict everything it has declared to be essential for the improvement of the standards of the bar in the interest of the welfare of the people of this State.

Refusal to permit unlawful and unlicensed practice has not only been the policy of this court but it is also in accord with the legislative policy of the General Assembly for more than a quarter of a century. In 1905 (Laws 1905, p. 48, now Secs. 11695-11703, R. S. 1929), minimum educational standards were declared, and this court was directed to take complete and exclusive charge of admitting and licensing attorneys to practice in all courts. Ever since 1889 (Sec. 610, R. S. 1889), it has been a misdemeanor to "practice law in any court of record without being licensed, sworn and enrolled." Over 100 years ago, by an act approved December 18, 1824, unlicensed practice was declared contempt of court, and every licensed attorney was required to "take the oath prescribed by the Constitution and

an oath that he will faithfully demean himself in his practice."
[Vol. 1, R. S. 1825, pp. 158, 159; now Secs. 11704-11706, R. S. 1929.]
Laymen practicing law undertake no such obligations. Recognizing
this and for the other reasons herein mentioned, the Legislature,
under its police powers, enacted in 1915 (Laws 1915, p. 99, now
Secs. 11692-93-94, R. S. 1929) statutes "primarily intended to pro-
tect the public from the rendition of certain services, deemed to re-
quire special fitness and training on the part of those performing the
same, by persons not lawfully held to possess the requisite qualifi-
cations." [State v. St. Louis Union Trust Company, supra.] These
prohibit "any (unauthorized) person, association or corporation"
from engaging in the "practice of law" or doing "law business;"
prohibit licensed attorneys from dividing fees or compensation there-
for with any person not a licensed attorney; make any such act a
misdemeanor, providing treble recovery as a further penalty; define
"practice of law" to include "the drawing of papers, pleadings or
documents or the performance of any act in (representative) capacity
in connection with proceedings pending or prospective before any
court of record, commissioner, referee or any body, board, committee
or commission constituted by law or having authority to settle con-
troversies;" and define "law business" to be "the advising or
counseling for a valuable consideration of any person, firm, associa-
tion or corporation as to any secular law or the drawing or the pro-
curing of or assisting in the drawing for a valuable consideration of
any paper, document or instrument affecting or relating to secular
rights or the doing of any act for a valuable consideration in a repre-
sentative capacity, obtaining or tending to obtain or securing or
tending to secure for any person, firm, association or corporation
any property or property rights whatsoever." While the contract
sought to be enforced herein was entered into prior to these 1915
statutes (they were approved March 22, 1915), most of plaintiff's
operations, during more than two years thereafter, were after its
effective date and aided in direct violations of it. Practically all of
defendant's activities, under the contracts secured by plaintiff for
him, took place after these laws were in effect, and they perhaps
have not yet terminated. [See Berthold-Jennings Lumber Co. v. St.
L., I. M. & S. Railroad Co. (C. C. A.), 80 Fed. (2d) 32.] Moreover,
without any statute, this court would have the right to define what
constituted practicing law. [Clark v. Austin, supra.] Since most
of the railroads involved were put under receivership, much of the
litigation over these claims was necessarily handled in the Federal
courts. That did not make defendant's activities throughout this
State proper, nor does it afford any basis for this court enforcing the
contract herein involved.

But regardless of these statutes prohibiting such conduct as

was contemplated by the contract herein, and regardless of this court's duty to regulate the conduct of lawyers and the practice of law in the interest of proper administration of justice (either of which are good grounds for affirmance of this judgment), the contract sued on herein is void even if considered only in the light of common-law rules. The law of champerty and maintenance is in force in this State. [Breeden v. F. M. A. & P. Glass Ins. Co., 220 Mo. 327, 119 S. W. 576; Kelerher v. Henderson, 203 Mo. 498, 101 S. W. 1083; Phelps v. Manecke, 119 Mo. App. 139, 96 S. W. 221; Taylor v. Perkins, 171 Mo. App. 246, 157 S. W. 122.] Barratry is by statute a criminal offense. [Sec. 3926, R. S. 1929.] The purpose of the law of champerty and maintenance was to prevent officious intermeddling in the affairs of others for purposes of speculation or other unworthy motives, and to prevent the strong and influential men of early English times from oppressing the weak. [5 R. C. L. 272, sec. 4; 11 C. J. 234, secs. 7-10; 4 Blackstone's Commentaries 135, Chap. 10, secs. 11-12-13.] It is now considered to be advantageous to many people, who are not financially able to pay cash fees for legal services, to obtain representation for establishment of their rights by contracting with regularly licensed lawyers upon a contingent basis. In recognition of this fact, early common-law rules have been drastically modified to allow such agreements. They are authorized by our statutes (Secs. 11716, 11717, R. S. 1929) which also create a lien in favor of attorneys for their enforcement. However, there are still contracts which attorneys are forbidden by the law of champerty to make. [Taylor v. Perkins, 171 Mo. App. 246, 157 S. W. 122; see Id., 183 Mo. App. 204, 170 S. W. 409.]

Even under the strict common-law rule, it was proper to ''maintain the suit of his near kinsman, servant, or poor neighbor, out of charity and compassion'' (4 Blackstone 135) but this did not authorize champerty, which was a bargain with another ''to divide . . . matter sued for between them if they prevail at law.'' [4 Blackstone 136.] ''Where sordid gain is the contractual motive, the ties of blood and of charity and friendship are succeeded by selfishness, and what would have been humane maintenance becomes unlawful champerty.'' [Taylor v. Perkins, supra.] When a layman ''without interest in the matters out of which a legal controversy arise'' agrees to ''employ lawyers and get up evidence at his own expense'' for a share in what may be recovered, such an agreement is champertous, unlawful and void in this State and in the majority of the states. [Phelps v. Manecke, 119 Mo. App. 139, 96 S. W. 221; Ann. Cas. 1918A, 797, note; 11 C. J. 248, sec. 34; 5 R. C. L. 278, sec. 5.] The contract sued on was a contract to engage and assist in champerty, and it is likewise unlawful and void.

This court should therefore refuse to enforce this contract, and

leave parties where they have placed themselves, for the reasons stated by the Kansas City Court of Appeals in Phelps v. Manecke, supra, as follows:

"If the law catches two in an evil transaction, it will frequently punish both, but it never lends the assistance of the courts to one of these to enforce the other's promise. Not that the law favors the promise more, or the promisor less, but it is so utterly indifferent between the two as to refuse to move its machinery at the request of either."

The judgment is affirmed.

PER CURIAM:—The foregoing opinion by Hyde, C., is adopted as the opinion of the Court en Banc. All concur, except *Douglas, J.*, not sitting.

### ON MOTION FOR REHEARING.

HYDE, C.—■ Many questions urged on motion for rehearing have been fully discussed in the oipnion, but it is contended that the issue of illegality of the contract sued on should not have been raised by the court *sua sponte*, because it was an affirmative defense waived by failure to state it in the answer, and because the case was a purely private controversy in which the public policy of practice of law by laymen was not presented by the pleadings. A sufficient answer, even if the broader aspects of the public interest in the regulation of the practice of law be disregarded, is that the illegality of the contract was affirmatively shown by the facts stated in plaintiff's fourth amended petition, and therefore on the face of the record proper it appears that plaintiff was not entitled to the relief asked. [See 6 R. C. L. 818, sec. 215; Scott v. Brown (1892), 2 Q. B. Div. 724; Shohoney v. Q., O. & K. C. Railroad Co., 231 Mo. 131, l. c. 147, 132 S. W. 1059; Oscanyan v. Winchester Arms Co., 103 U. S. 261, 26 L. Ed. 539; Noonan v. Gilbert, 68 Fed. (2d) 775; Waychoff v. Waychoff (Pa.), 163 Atl. 670, 86 A. L. R. 190.] It is unfortunate that apparently plaintiff's creditors are the real losers in this case. They naturally and properly sought repayment out of funds which they had reason to believe might come into his possession. Nevertheless, their claim is only based on assignment from him and it can rise no higher than its source.

In the matter of public interest, it can make no difference, as plaintiff suggests, that in Clark v. Austin, 340 Mo. 467, 101 S. W. (2d) 977, the question of unlawful practice was raised and brought before the court by action of the court's advisory committee. Certainly, if it is proper for the court to appoint an advisory committee to investigate and raise such questions concerning prevention of un-

lawful practice in cases not before this court, then surely it is proper for this court to raise such a question in a case pending before it where unlawful practice and unlawful practices constitute the basis for the relief asked. To do otherwise would be to punish one violation of the law and reward another. This court believes that it has the responsibility and the duty to concern itself both with regard to proper conduct of licensed practitioners and with unlawful practice of law by all others to the end that legal services required by the public, and essential to the administration of justice, will be rendered by those who have been found by investigation to be properly prepared to do so by conforming to strict educational standards, and who demonstrate that they have the character to conform to higher standards of ethical conduct than are ordinarily considered necessary in business relations which do not involve the same fiduciary and confidential relationships. To enforce such standards of ability, knowledge and conduct, it is necessary in the public interest to prevent those who will not or cannot comply with them, from engaging in competition for legal work with those who must and do observe them, especially when, as here, such employment is obtained by advertising and soliciting rather than by being sought out because of known integrity and ability. [See In the Public Interest (Clark), 2 Mo. Law Review 161.] One of the most effective means of preventing encroachment by such unauthorized practioners is to prevent them from profiting by such "chiseling" activities as "high pressure" solicitation for legal business. No doubt our Legislature had this in mind when it passed Section 11694, Revised Statutes 1929, which not only made such acts a misdemeanor subject to a fine, but also provided for recovery from an unlawful practitioner of *treble* the amount collected by him for his compensation.

Plaintiff also contends that his contract should be enforced because it was made before the Legislature enacted Sections 11692-11694, Revised Statutes 1929. These sections are based upon the police power of the State (Clark v. Austin, supra), and it is well settled that "parties cannot remove their transactions from the reach of dominant constitutional power by making contracts about them." [Norman v. B. & O. Railroad Co., 294 U. S. 240, 55 Sup. Ct. 407, 79 L. Ed. 885.] Not only are individuals powerless to contract against proper exercise of the police power of the State, but even the Legislature is specifically prohibited by the Constitution from abridging it in any way. [Sec. 5, Art. XII.] While plaintiff further contends that Dahlberg was not practicing law, this is settled by the principles stated in Clark v. Austin, supra, and State ex inf. McKittrick v. Dudley & Co., 340 Mo. 852, 102 S. W. (2d) 895, and it would serve no useful purpose to discuss them again in this case. Further discussion and collation of cases may be found by reference to 85 U. of Pa. Law Review 432; 83 U. of Pa.

Law Review 357; 41 Yale Law Review 69; 29 Mich. Law Review 989.

The question of public policy involved is argued from the standpoint that it was good public policy to allow shippers to obtain refunds of charges exacted from them in violation of rates fixed by the laws of this State, and that the parties here were assisting such a purpose. No one will question the propriety of such recovery and all reasonable and lawful methods to accomplish it, but Dahlberg's interest (nor plaintiff's either) was not a purely altruistic crusade against railroads violating the law. He was not even seeking employment as an accountant only. His activity was induced by the idea of his own gain, not from merely the work of computing rates but from controlling the settlement of rights of claimants involved in this situation and of acting for them not only in determining the amount of their claims but also in enforcing them in the courts up to the highest in this State and Nation. He made an intensive solicitation, personally and by agents, to obtain control of claims so that he could obtain for himself half of what those entitled to such refunds would receive. He was authorized to say what action should be taken and when; and to employ lawyers to do what he thought should be done. Services of an accountant and rate expert were no doubt not only helpful but necessary in carrying on such litigation, and it would have been entirely proper for him to have been employed *as such* by claimants, and to be paid whatever that kind of work was worth (or even to be paid on a contingent basis), but that did not give him the right to be the lawyer as well as the accountant for these claimants, by constituting himself their legal representative to control and carry on their litigation. Plaintiff finally says that, even if Dahlberg was practicing law, he was not; and, citing Kelerher v. Henderson, 203 Mo. 498, 101 S. W. 1083, says that the contract between plaintiff and Dahlberg was separate and distinct from the contracts between Dahlberg and Shippers and would not be tainted with any illegality therefrom. This is also answered by the principles stated in Clark v. Austin, supra, and State ex inf. McKittrick v. Dudley & Company, supra; and it further appears that plaintiff's contract violates another vital precept of public policy; namely: It is an agreement to make personal solicitation to obtain law business which neither lawyers nor laymen can be permitted to do nor to have done for them. Moreover, the contract which plaintiff seeks to enforce specifically provided that "this forms a special partnership between us for the handling of the particular matters referred to."

The motion for rehearing is overruled.

PER CURIAM:—The foregoing opinion by HYDE, C., on motion for rehearing in Division No. One is adopted as the opinion of the Court en Banc. All concur, except *Douglas, J.*, not sitting.