433 P.2d 993

Jack NUTTER and Jane Doe Nutter, husband and wife, Appellants,

v.

Harry BECHTEL, Appellee.

No. 2 CA–CIV 314.

Court of Appeals of Arizona.

Nov. 28, 1967.

Rehearing Denied Dec. 29, 1967.

Review Denied Feb. 15, 1968.

**502**

Cox & Johnson, by Donald C. Cox, Eloy, for appellants.

Johnson & Shaw, by Marvin Johnson, Phoenix, for appellee.

MOLLOY, Judge.

This litigation arises out of an alleged oral contract to divide a real estate commission between three real estate brokers operating in Pinal county, Arizona.

The three real estate brokers are Harry Bechtel, the plaintiff, Jack Nutter, a defendant, and George Wake, a defendant. The case is differentiated from the usual sharing of commission case by the fact that the sale upon which Bechtel claims the right to share in the commission is one in which Nutter, a sharing broker, was the buyer.

In the trial court, judgment was rendered in favor of Bechtel, and against Wake and Nutter in the amount of $5,000 each. The evidence discloses without question that the total commission received or to be received by Wake as a result of the sale in question was $30,000. Most of the other facts are in dispute, and on appeal this court is obligated to view the evidence in the light favorable to supporting the result reached in the trial court. Daru v. Martin, 89 Ariz. 373, 363 P.2d 61 (1961). We state the facts in accordance with this requirement, including, however, some of the discrepancies in the evidence, both for the reason that it is unclear in some instances which version of the evidence is most favorable to the plaintiff's position and also because one of the contentions raised on appeal is that the testimony of the plaintiff Bechtel is so inconsistent that it was not worthy of belief by the trial court.

The story to be told commences in the early part of 1963, at which time Bechtel was working on the sale of a large farm belonging to a certain Carl Mumme and wife. Part of the time Bechtel worked under an oral listing from the owners and part of the time under a written listing. There was to be a 5 per cent commission paid.

Nutter, in addition to being a real estate broker, was in the business of "farm land

developing," and from time to time bought land for development purposes. From the evidence, one may gather that it was Nutter's practice to insist that any real estate broker involved in a purchase made by him would "pool" or share the commission with him. According to Nutter, this was in the form of a "professional courtesy" to be extended by a fellow real estate broker and was a common practice to the extent that: "It's done every day." [1]

According to Nutter, in the case of the Mumme farm, he was proposing to form a syndicate to buy and develop the land. Nutter's testimony as to the nature of the "pooling" agreement was that the commission would be shared "50-50." According to Nutter, this agreement was made in May of 1963, was never changed, and lapsed by reason of the expiration of time, the purchase of the Mumme farm not taking place until June 1, 1964.

According to Bechtel, the original agreement with Nutter occurred in either April or July of 1963 (his testimony was not consistent), and originally was an agreement under which Bechtel was to receive the first $20,000 of any commission and Nutter was to receive all commission over this amount. Bechtel testified that in late 1963, or early 1964 (again his testimony is not consistent), the verbal agreement to share a commission was modified by the inclusion of another broker, the defendant Wake, in the "pooling" arrangement. Bechtel stated that Wake was to receive one half of the $20,000 which was to be Bechtel's share of the hoped-for commission and also that the commission was to be divided "⅓, ⅓, ⅓" amongst Nutter, Wake and himself. Inasmuch as the Mumme-Nutter sale resulted in a total commission of $30,000, either version of Bechtel's testimony results in the same mathematical computation.

According to Bechtel, Wake was brought into the arrangement at the suggestion of Nutter, because Bechtel had been unsuc-cessful in persuading the owners to accept any of Nutter's offers, a number of which Bechtel presented to the Mummes during the calendar year 1963. The offers submitted were from "Jack Nutter or nominee" and ranged from an offer of $450,000 to an offer of $620,000. The submitted offers were unacceptable to the owners of the farm for various reasons involving release clauses and the payment of the expenses of a crop planted upon the farm. In addition, the Mummes informed Bechtel in approximately July, 1963, that they did not wish to sell to Nutter because of his "reputation." According to Bechtel, Nutter was of the opinion that Wake might better be able to approach the Mummes with his offers.

At the time Wake was brought into the "pooling" agreement, it was agreed that Bechtel would stay out of the negotiations entirely in order to leave a clear field for the presentation of Nutter's offer or offers to the owners. Bechtel accordingly ceased his efforts to sell the farm and from time to time asked both Wake and Nutter, separately, how the "deal" was progressing. On these occasions, Bechtel was informed in general terms that negotiations were still being conducted and that some progress was being made. In June, 1964, Bechtel learned of the sale from the Mummes to a "Blackstone Investment Company," a corporation owned and controlled by Nutter. At this time, Bechtel insisted upon a meeting with Nutter and Wake. At the meeting (a disinterested fourth real estate broker was present), Bechtel demanded that the commission be divided "a third, a third and a third," according to "the agreement." Neither Wake or Nutter denied there was such an agreement but contended that it had elapsed by expiration of time.

The actual sale made of the Mumme farm was in pursuance of an "exclusive right and authority to sell or purchase" given by the Mummes to "George Wake, Land Broker, or his Assignees," dated May 31,

1. Deposition of the defendant Nutter, at 10.

1964, and expiring midnight June 10, 1964. This exclusive listing provided for a real estate commission of $30,000. The escrow instructions providing for the details of the sale showed "George Wake and/or his nominees" as the buyer, and, in escrow, Wake designated Blackstone Investment Company as his nominee-purchaser. For the purposes of closing the sale, Wake, who had no real interest in this corporation, was made the president of Blackstone Investment Company, in order to execute the necessary documents to close the sale. At the trial, Wake admitted that he was a "front and a figurehead and nothing more" in this capacity.

All of the money necessary to close the sale was furnished by Nutter, and, in escrow, Wake assigned one half of his commission earned on this sale to Nutter. Blackstone was a defunct corporation "reactivated" solely for the purpose of buying this property. The Mummes first learned that they were in effect selling their farm to Nutter, whom they considered to be an undesirable buyer, through Bechtel, but proceeded with the sale despite this fact. By the time of the trial, Blackstone had sold a part of the land purchased to a "trust" in which Nutter was one of the beneficiaries.

That we are close to an agreement void for illegality is indicated by decisions such as Peaden v. Marler, 78 Okl. 200, 189 P. 741 (1920); see 12 Am.Jur.2d Brokers § 175, at 916–17.

■ However, there is no evidence in this record that Bechtel in any way joined in or approved of the arrangement to conceal the identity of the buyer from the owners. The record is silent as to whether the original commission-sharing agreement between Bechtel and Nutter was kept from the Mummes. The briefs do not raise the question of illegality. Though this court has the responsibility of raising the question of illegality sua sponte, we believe this power should be exercised with restraint and reserved to cases where the prevailing party is more tarnished with the underhanded dealings than in this case. Ostrowsky v. Berg, 337 Ill.App. 422, 86 N.E.2d 546 (1949); Hart v. Bell, 222 Minn. 69, 23 N.W.2d 375, 24 N.W.2d 41 (1946); O'Mara v. Dentinger, 271 App.Div. 22, 62 N.Y.S.2d 282 (1946); cf. Curry v. Dahlberg, 341 Mo. 897, 110 S.W.2d 742 (1937).

The first question presented for review is:

"1. The question is since Bechtel was treating Nutter as a buyer and not as a co-broker, except during the period of the exclusive listing April 8, 1963 and terminating April 23, 1963, the alleged agreement would be in violation of the Statute of Frauds?"

The question posed makes reference to the portion of the testimony not delineated above. During the trial, Bechtel testified as follows:

"Q He [Nutter] was employing you or authorizing you as his agent or broker to get this property for him, is that right, because he was your buyer?"

"A He was the buyer.

"Q And he authorized and employed you as his agent or his broker to purchase the Mumme farm, to get the Mumme farm?"

"A Yes."

■ Taken alone, this testimony might very well place the contract within the prohibition of A.R.S. § 44–101, subsec. 7.[2] However, there is no testimony in the record that Nutter agreed to pay Bechtel any compensation of any kind for finding property for him to purchase. All of the tes-

---

2. A.R.S. § 44–101 reads, in pertinent part: "No action shall be brought in any court in the following cases unless the promise  *  *  *  is in writing  *  *  *
*    *    *    *    *

"7. Upon an agreement authorizing or employing an agent or broker to purchase or sell real property, or mines, for compensation or a commission."

timony pertains to Nutter's sharing in a commission to be received by Bechtel or both Bechtel and Wake. In *Bush v. Mattingly,* 62 Ariz. 483, 487, 158 P.2d 665, 667 (1945), our Supreme Court commented upon the application of this provision in our statute of frauds to a commission-sharing agreement:

"With reference to the applicable portion of the statute of frauds it was there said [in *Gorham v. Heiman,* 90 Cal. 346, 358, 27 P. 289, 292 (1891)] that 'that provision was only designed to protect owners of real estate against unfounded claims of brokers. It does not extend to agreements between brokers to cooperate in making sales for a share of the commissions.' "

We hold that the subject contract is not violative of the statute of frauds.

The second question presented for review is stated:

"If an express contract is alleged that the nominee of Nutter was the purchaser, is it essential that all of the elements of an express contract must be proven, to wit: that the nominee of Nutter was the purchaser?"

We hold that the sharing contract, which contemplated that "Nutter or nominee" would be the buyer of this property, is sufficiently satisfied by the purchase of this property by Blackstone Investment Company, a company owned and controlled by Nutter.

■ Generally, agreements of real estate brokers to "pool" their efforts and commissions in regard to a particular property are regarded by the law as creating something in the nature of a joint enterprise, giving rise to certain fiduciary duties between the contracting brokers. *Arnold v. Humphreys,* 138 Cal.App. 637, 33 P.2d 67 (1934); see 30 Am.Jur.Joint Adventures § 20, at 953–54, and Annot., 171 A.L.R. 1012, at 1013–1015.

■ Even without any fiduciary relationship, the law does not permit the purchasing of property through a wholly owned and controlled corporation to defeat a commission otherwise earned. *Erwin v. Wender,* 78 Ga.App. 94, 50 S.E.2d 244 (1948); cf. *Zellan v. Winston,* D.C.Mun. App., 108 A.2d 163, 164 (1964); and *Pigg v. Roberts,* 311 Ky. 858, 226 S.W.2d 35 (1950). With a fiduciary duty present, as here, we have no hesitancy in holding that Blackstone Investment Company was the alter ego of Nutter, *Employer's Liability Assurance Corp. v. Lunt,* 82 Ariz. 320, 313 P.2d 393 (1957), so that the sale to that corporation sufficiently satisfied the sharing agreement between these brokers.

The third question presented for review is:

"The question is was there any consideration, subsequent to Bechtel's exclusive listing, to support a contract between Bechtel and Nutter?"

■ The agreement to "pool" efforts and commission is in and of itself supportive of the consideration requirement. If the complaining party has done all that it is required of him under such an agreement, he is entitled to enforce the agreement by an appropriate action. 12 Am. Jur.2d Brokers § 174, at 915–16; 12 C.J.S. Brokers § 81, at pp. 176–177. The agreement to abstain from future efforts to sell this particular property would furnish sufficient consideration for this particular agreement. Cf. *Morrison v. Franck,* 59 Or. 429, 110 P. 1090, 117 P. 308 (1911); and *Bauer v. Crow,* 110 Tex. 538, 221 S.W. 936 (1920).

■ In addition to arguments supporting these three questions presented, the appellants' brief contains a section entitled "General" in which the appellants argue that because Bechtel's testimony and pleadings are so inconsistent, the trial court was not justified in accepting Bechtel's version of the facts. Our Supreme Court has indicated that the credibility of witnesses is a matter peculiarly within the province of the trier of facts. *State v. Ballesteros,* 100 Ariz. 262, 413 P.2d 739 (1966); *Builders Supply Corp. v. Shipley,* 86 Ariz. 153, 341 P.2d 940 (1959). Though there are many inconsistencies in the statements

of Bechtel, we believe much of the variance is the result of faulty memory and the informal manner in which these parties dealt with one another. We follow the general law in leaving to the trial court the responsibility of resolving the many inconsistencies in the testimony presented in this action.

Judgment affirmed.

HATHAWAY, C. J., and KRUCKER, J., concur.