**John A. WATKINS, Plaintiff-Appellant,**

**v.**

**Larry FLOYD and Sherman Floyd, Defendants-Respondents.**

**No. 9283.**

Missouri Court of Appeals, Springfield District.

March 14, 1973.

John A. Watkins, pro se.

Lewis B. Hoff, Stockton, Fowler & Short, El Dorado Springs, for defendants-respondents.

TITUS, Chief Judge.

Unfortunately the events giving rise to this cause did not die aborning for, as we shall see, they produced a farrago of claims and counterclaims the likes of which are rarely, perhaps never, found in a single action. Plaintiff (substituted for his alter ego corporation after the case was commenced) has appealed from a decree which denied all his claims and vested title to the subject real estate in one of the defendants.

The paper issues: Plaintiff sued in ejectment to recover possession of the property in question, for rents and profits, "and for a decree . . . finding and declaring that the legal title to said land is vested in the plaintiff." Defendants denied the petition and affirmatively alleged: (1) that plaintiff was estopped to deny or challenge the defendants' title and, (2) that plaintiff's corporation could not maintain this claim because its attorney (the substitute plaintiff) was in violation of former Rules 4.28 and 4.30, V.A.M.R. (or as stated by the trial court, was guilty of champerty

and maintenance). By way of counter-claim in the event "a judgment of dispossession be given," defendants sought to recover from plaintiff the total sum of $6,740, said to represent what defendants paid to purchase and improve the premises. In addition, defendants prayed the court to "try, ascertain, adjudge and decree the title and interest of the respective parties" in and to the real estate. By reply, plaintiff, inter alia, asserted defendants' claim to title and possession was void by reason of § 513.300, RSMo 1969, V.A.M.S. Thus, what started as a simple ejectment suit was, by the pleadings, transformed into a case requiring a hearing and determination of the issues as an equitable proceeding. Rule 93.01; § 527.150, RSMo 1969, V.A. M.S.; Reynolds v. Stepanek, 339 Mo. 804, 810, 99 S.W.2d 65, 68[5] (1936).

H. R. and Lois Fulbright were the common predecessors in title of plaintiff and defendants, and, chronologically, the purported titles acquired by the parties were obtained as follows: An execution on a judgment against the Fulbrights was delivered to defendant Sherman Floyd as Sheriff of Cedar County. He levied on the real estate in question as property of the Fulbrights (§ 513.090[5], RSMo 1969, V. A.M.S.), advertised that it would be sold August 15, 1969, at public vendue (Rule 76.36; § 513.205, RSMo 1969, V.A.M.S.), and on that date for a bid of $5,300, struck off the property to himself and his son, defendant Larry Floyd, as purchasers. Also on August 15, 1969, defendant Sherman Floyd executed a sheriff's deed unto "Sherman Floyd and Larry Floyd, as joint tenants with right of survivorship," and in "open Court . . . acknowledged the said instrument to be his act and deed as Sheriff for the purposes therein mentioned." Rules 76.50, 76.51 and 76.52; §§ 513.275, 513.280 and 513.285, RSMo 1969, V.A.M.S. The deed was recorded August 18, 1969. Rule 76.53; § 513.290, RSMo 1969, V.A.M.S. In excess of Rule 76.02, § 513.025, RSMo 1969, V.A.M.S., the sheriff (defendant Sherman Floyd) applied the

money arising from the sale in this manner: $1,238.34 to the payment of the judgment, interest, court costs and sheriff's commission; $129.75 and $159.76, respectively, to pay city and county real estate taxes on the property; and $2,612.39 to the holders of Fulbrights' note secured by a deed of trust to the real estate sold at the sheriff's sale. The balance, $1,159.76, was paid to the Fulbrights. Plaintiff's evidence and the essence of his testimony when called as a witness by defendants revealed that plaintiff's interest in this particular matter was piqued upon his appointment to defend two indigent defendants charged with committing crimes in Cedar County and when he opined the sheriff (defendant Sherman Floyd) had perjured himself at a pre-trial hearing on a motion to suppress evidence. Pending trial of these charges, plaintiff heard the sheriff had been buying land at his own sheriff's sales. As a consequence, plaintiff checked the records for violations of the law by the sheriff, intending to use this information for impeachment purposes at the criminal trials. Such evidence was, in fact, discovered and employed by counsel at the proceedings. Subsequently plaintiff directed letters to the sheriff, the prosecuting attorney and the Attorney General regarding, among other things, the sheriff's alleged illicit activities at his own sales. Being dissatisfied with the response to his epistolary efforts, plaintiff contacted the Fulbrights, explained the legal situation as he understood it, and advised them that if they desired to take any steps to correct the matter he could not represent them in their action. When the Fulbrights displayed no interest, plaintiff offered them $100 for a quit claim deed to the property. The Fulbrights accepted and on February 20, 1970, they gave a quit claim deed to the real estate to plaintiff's corporation; by warranty deed dated December 30, 1970, and recorded the next day, the corporation conveyed the property to plaintiff for a recited consideration of $2,500.

Much of the testimony given by the defendants was equivocal; a considerable sum of the sheriff's recitations was self-contradictory. Nevertheless, to avoid prolixity, we undertake to summarize their statements without taking particular note of all the inconsistencies. Prior to the sheriff's sale defendants agreed between themselves that the sheriff would bid in the property for defendant Larry Floyd (the son), that the sheriff would sign a note with Larry to obtain money to pay for the property and that the property would be put in their joint names. Larry did not instruct the sheriff what to bid for the property at the sheriff's sale; neither did he set a limit on what was to be bid— he just told the sheriff "to use his own best judgment." Defendants contended the sheriff's name was to appear on the title "more or less for security of this property [or] in the event something happened to Larry." The son, defendant Larry Floyd, did not attend the sheriff's sale and the sheriff did not testify that at the sale he announced for whom he was bidding. A witness who was present at the sale was "not certain" whether the sheriff "announced at the sale . . . that he was supposed to bid for his son." In any event, the sheriff bid in the property at the sale and was "responsible for having the names of the purchasers [Sherman Floyd and Larry Floyd] inserted in the deed." Although the sheriff's deed (dated and acknowledged the same day as the August 15, 1969, sheriff's sale) recited the sale was made for $5,300 "in hand paid by said Sherman Floyd and Larry Floyd, the receipt whereof I do hereby acknowledge," at least $4,300 of the purchase was not paid until August 18, 1969, on which date, by their unsecured promissory note, the defendants jointly borrowed that sum of money from a bank. On the day of the trial (March 2, 1971) Larry testified he had paid $1,100 principal and "around $450" in interest on the $4,300 note. However, in "Answers to Interrogatories filed by the defendants on the 18th of December

1970," two months plus before the trial, defendants represented "Said Note is marked 'Paid.' " The record does not identify the person or persons who paid that portion of the principal and interest on the $4,300 note which Larry did not pay. Defendants' Exhibit 2 was a quit claim deed purporting to convey the sheriff's interest in the property to defendant Larry Floyd: the deed was dated the day before the trial herein commenced. Both defendants vowed that at some unsure time the sheriff had delivered the sheriff's deed to Larry, but Larry acknowledged during cross-examination that when asked on deposition if the sheriff's deed had ever been delivered to him or if he ever had the sheriff's deed in his possession, his answers at that time were "No."

The initial question is whether the purchase made by defendants at the August 15, 1969, sheriff's sale was valid and vested them with any title to the property. There should be no need to pause ponderously on this point for it is a plain matter of statutory provision. Section 513.300, RSMo 1969, V.A.M.S., recites: "No officer to whom any execution shall be directed, or any of his deputies, or any person for them, shall purchase any goods or chattels, real estate or other effects, or bid at any sale made by virtue of such execution, and all purchases so made shall be void." This statute but gives expression to a policy respected long before its passage. "It was always understood that the officer holding an execution should be removed from all temptations to the fraudulent exercise of his authority. To accomplish this object, it has ever been held that he should, under no circumstance, be interested in the sale." 2 Freeman on Executions (3d Ed.) § 292, at p. 1681; 30 Am.Jur.2d Executions § 355, p. 654.[1] Moreover, when an execution

purchase is made void, as provided by § 513.300, supra, it may be urged in a direct attack upon the sale or "by way of collateral attack, as in ejectment or in some other action to recover possession or establish title." 33 C.J.S. Executions § 242, pp. 506–507.

In part agreeable with the foregoing, the court nisi held the joint purchase by defendants at the sheriff's sale was "void and of no effect insofar as [the sheriff] personally was concerned." Nevertheless, it also found that defendant "Larry Floyd was an eligible purchaser at said sale and was such and became the legal owner of subject realty at said sale." It is upon this latter conclusion that we and the trial court part company. From different points of view plaintiff and the trial judge belabored Shotwell v. Munroe, 42 Mo.App. 669 (1890), an aged but unsullied opinion. The reported case portrays a minister whose proclivity to blooded steeds introduced him into the society of judgment debtors. An execution was issued against the reverend and the sheriff levied upon his horseflesh. Ere the sheriff's sale came to fruition, the sheriff, one Shotwell, and four others agreed they would purchase the stock at the sale, hold the horses in trust for the preacher, and upon their resale account to him for any surplus after payment of the execution and the expenses connected with the keep and sale of the stock. According to scheme, the sheriff knocked off the horses to Shotwell at the sheriff's sale. To raise money for the bid, the six associates executed a joint promissory note. Shotwell later obtained from the sheriff and the others a relinquishment of their interests in the animals on condition that Shotwell would satisfy the note. Before Shotwell could dispose of Don, a young stallion, another judgment creditor

---

I. Cf. Sales by guardians—Texier v. Texier, 342 Mo. 1220, 1231, 119 S.W.2d 778, 783 [6] (1938) ; Morris v. Karr, 342 Mo. 179, 183, 114 S.W.2d 962, 964 (1938) ; Bopst v. Williams, 287 Mo. 317, 334–339, 229 S.W. 796, 801–803 (1921) ; Miller v. Staggs, 266 Mo. 449, 455–456, 181 S.W. 116, 117, 187 S.W. 1159 (banc 1915) ; Carder v. Culbertson, 100 Mo. 269, 13 S.W. 88 (1890). Sales by executors or administrators—Wortham v. Marten, 354 Mo. 1, 5, 188 S.W.2d 11, 12 [2] (1945) ; Gilmore v. Thomas, 252 Mo. 147, 155, 158 S.W. 577, 578 (1913).

appeared on the scene with execution against the minister. A levy was made on Don as property of the preacher and Shotwell undertook to replevin him. Affirming Shotwell's loss in the trial court, the court of appeals (at pp. 678–679) said: "These provisions [of what is now Sec. 513.300, supra] are merely declaratory of the common law, resting on the soundest principles of public policy, which prohibit any trustee from becoming directly or indirectly interested in a sale made by him. . . . 'Not that every such case would necessarily be fraudulent, but it would furnish an inducement and temptation, which the wisest policy is *to utterly prohibit.*' The fact that the sheriff was the only one of six associate purchasers at the sale, cannot make any difference, as the sale was an entirety, and cannot be valid in part, and void in part."

■ The trial court, and we believe unsuccessfully, undertook to distinguish *Shotwell* from the present situation by dubbing defendants as "joint tenants" with no agency relationship between them (20 Am. Jur.2d Cotenancy and Joint Ownership § 2, at p. 93) and the associates in Shotwell as "partners" where agency did exist. Frankly, it escapes us how such a christening serves to distinguish, for we are not concerned with what defendants' relationship would have been had the purchase by them been valid but, rather, with the relationship that existed at the time the purchase was attempted. Lord Bacon is quoted as saying that " 'A thing is void which was done against law at the very time of the doing it, and no person is bound by such act.' " Tudor v. Tudor, 80 Vt. 220, 67 A. 539, 130 Am.St.Rep. 977 (1907). At the very time the sheriff at his own sale, jointly or otherwise, became a purchaser, directly or indirectly, it was an act done against the law, and, if agency be required as envisioned by the trial court, to compound the prohibited affair, the sheriff was also acting in the condemned role of double agent in exercising the unlimited authority conferred upon him by his intended joint tenant. "No servant can serve two masters: for either he will hate the one, and love the other; or else he will hold to the one, and despise the other." Luke 16:13. So came the rule of law to be applied with particular force in execution sales, id est, "an agent is not deemed to have authority to represent two principals [the judgment creditor and intended purchaser] whose interests are conflicting . . . .. A sheriff or other officer making a sale cannot, by an intending purchaser, be vested with any discretion to bid for him or on his account." 2 Freeman on Executions, supra, § 292, at pp. 1683–1684. "[T]he officer making the sale cannot, either directly or indirectly, become the purchaser, even though a third person is jointly interested in the purchase; . . . nor can he bid for the property, either for himself or as the agent of another . . . .. Generally a sale to the officer conducting the sale or to his agent is void." 33 C.J.S. Executions § 212 b., p. 457. It has been suggested that *the rule prohibiting a sheriff to bid and* purchase property for another at his own sale, might be open to question if the sheriff is limited to making but one definite bid. Regardless of this, however, it appears agreed that where the sheriff is not restricted to a single certain bid but, in acting as agent for another, has discretionary power to make bids and purchase the property as "his own best judgment" dictates, the sale is void and the sheriff's deed made in pursuance thereof is a nullity. McMillan v. Harris, 110 Ga. 72, 35 S.E. 334, 338 (1900); Coleman v. Malcolm, 101 Ga. 303, 28 S.E. 861, 862 (1897); 2 Freeman on Executions, supra, § 292, at p. 1683–1684. There can be no question in this case that if Sheriff Sherman Floyd was, in truth, bidding in the property for defendant Larry Floyd, he did so under the broadest carte blanche.

■ While a deed free from ambiguity must be construed by its terms alone [National Cylinder Gas Co. v. G. H. Packwood Mfg. Co., 208 S.W.2d 825, 827[2] (Mo. App.1948)] and defendants Sherman and

Larry Floyd were unambiguously denominated to be "joint tenants with right of survivorship" (32A C.J.S. Evidence § 994, at p. 508), the trial court, nevertheless, permitted testimony that the sheriff was included as a purchaser "for security purposes [or] in the event something happened to Larry." But irrespective of this parol evidence, the sheriff was in fact a purchaser and this rendered the prohibited transaction void. It was held in Bopst v. Williams, supra, 287 Mo. at 335–339[9], 229 S.W. at 801–803[13] (1921), under § 475.235, RSMo 1969, V.A.M.S., prohibiting a guardian from becoming a purchaser of his ward's property at a guardian's sale, that a guardian who sold her ward's property to her husband became an invalid and indirect purchaser at the sale because of a wife's prospective interest in the real estate of her husband. There is no reason to suppose the title attempted to be conveyed to the sheriff through his abortive purchase at his own sale, though taken for security reasons or in the event something untoward occurred to his joint purchaser, was not more real and immediate than that attempted to be acquired by the guardian in *Bopst*.

■ Defendants misconceived champerty and maintenance as a defense in this action and the trial court erred in foreclosing plaintiff's rights under the Fulbrights' deed for that reason. "Maintenance, in the modern view, 'is an officious intermeddling in a suit which in no way belongs to one, by maintaining or assisting either party, with money or otherwise, to prosecute or defend it.'" Moffett v. Commerce Trust Company, 283 S.W.2d 591, 596 (Mo.1955). "In other words it is the intermeddling in a suit by a stranger, one having no privity or concern in the subject matter and standing in no relation of duty to the suitor." 14 Am.Jur.2d Champerty and Maintenance § 2, p. 843. Champerty, a species of maintenance, is a bargain by a champertor with a party, whereby the champertor undertakes to maintain or carry on an action at his own expense in exchange for part of

the litigated matter in the event of a successful conclusion of the cause. 14 Am. Jur.2d, supra, § 3, pp. 843–844. The subject matter of the contract (deed) which plaintiff obtained via the Fulbrights is what he seeks to enforce here; this is not an action upon the contract itself as was the case in Curry v. Dahlberg, 341 Mo. 897, 110 S.W.2d 742, 112 S.W.2d 345 (banc 1937) upon which defendants rely. "The law does not impress upon the subject-matter of the contract its stamp of condemnation, but upon the contract itself. Unless the [plaintiff's] contract, by which [he] seek[s] to enforce [his] right, is infected with champerty, we see no reason why this suit may not be maintained, though such a contract exists between the [plaintiff and the Fulbrights]. It is time enough to turn a party out of court when he asks the aid of a court to enforce such a contract. . . . [T]he assignee of a promissory note could sue the maker and recover thereon, even though the contract of assignment was champertous. . . . The fact that certain collateral portions of the contract or transaction which is before the court is tainted with illegality that fact will not defeat a recovery upon the other provisions of the contract, which in themselves gives a complete cause of action, without the assistance of the infected portions." Kelerher v. Henderson, 203 Mo. 498, 515–516, 101 S.W. 1083, 1087 (banc 1907); Roeder v. Robertson, 202 Mo. 522, 538–539, 100 S.W. 1086, 1090 (1907). It can only be the contract between plaintiff and the Fulbrights that defendants and the court nisi could contend was fraught with champerty and maintenance. That contract, assuming but not holding it tainted with champerty and maintenance, "would not be a defense to this lawsuit; but if that contract is invalid that matter would be pertinent if and when the [plaintiff] ask[s] the aid of a court to enforce it [against the Fulbrights]." First Nat. Bank of Kansas City v. Kavorinos, 364 Mo. 947, 954[6], 270 S.W.2d 23, 28[6], 47 A.L.R.2d 1163, 1169[7], (banc 1954); 14 Am.Jur.2d, supra, § 15, p. 853.

As to estoppel: The rule is that estoppel by acceptance or ratification of an act or transaction does not apply if the act or transaction be void for violation of a mandate of the law. "Estoppel in pais is applicable to a right or a title which is voidable, or one which is defeasible, and usually has no application at all to a purported right wholly void from its inception and which actually never existed." Atlantic Nat. Bank v. St. Louis Union Trust Co., 357 Mo. 770, 782, 211 S.W.2d 2, 8–9[13, 14] (1948). Equitable estoppel is impotent to save transactions from the fatal infirmity of being in violation of the law. Himmel v. Leimkuehler, 329 S.W.2d 264, 271 [9, 10] (Mo.App.1959). The purported purchase by the defendants being void, it is as though it never existed. Being void, neither the acceptance by the Fulbrights of any moneys realized from the sale nor their failure to assert its invalidity, could breathe life into it and make valid a purchase void from its inception. Even if we were to assume all the elements of defendants' contention of estoppel as present in the case at bar, that theory is not available to them either as against the Fulbrights or the plaintiff.

Plaintiff is correct in asserting that if a good faith occupant is to be reimbursed for improvements he makes on lands of another under the "betterment acts" or "occupying claimant laws" (Rule 89.16; § 524.160, RSMo 1969), his compensation is to be figured on the amount by which the value of the property has been enhanced because of the improvements and not upon the actual value of the improvements themselves or the cost of the improvements to the occupant. Consequently, defendants assumed an erroneous theory under their conditional counterclaim when they undertook to recover their alleged costs of improving the real estate subsequent to the sheriff's sale. City of Poplar Bluff v. Knox, 410 S.W.2d 100, 103[7, 8] (Mo.App. 1966), and authorities there cited.

Setting aside a voidable execution sale in an independent equity suit entails placing the affected parties in status quo as far as possible. The court generally will not grant relief except on condition that complainant do equity by indemnifying the purchaser for his bid and the sum his improvements, if any, enhanced the value of the property, less whatever rents and profits may be due the complainant while he was denied possession. 2 Freeman on Executions, supra, § 310a., pp. 1815–1816. In addition, the judgment creditor should be restored to his judgment rights and title and possession should be returned to the execution debtor. 33 C.J.S. Executions § 241, at p. 505. The problems presented here are extremely onerous; not only was the purchase rendered void by the legally prohibited actions of the sheriff, but he compounded the situation by not paying all the surplus remaining after satisfying the execution in his hands to the judgment debtors. 33 C.J.S. Executions § 251, pp. 517–518. It seems apparent that the payments by the sheriff were made either with full knowledge of all the facts or with unlimited opportunity to inform himself, so that any misconception he might have harbored regarding his official or personal obligations must be regarded as a mistake of law. Such payments, even in equity and good conscience, cannot be recovered. American Motorists Ins. Co. v. Shrock, 447 S.W.2d 809, 811–812[1–2] (Mo.App.1969). The purchase was void, and although no one may have been in a position to have legally demanded any of the moneys paid therefor, the sheriff would not be entitled to recoup the payments made by him, "[f]or, in the absence of fraud or duress, a payment, even of an illegal demand, voluntarily made with full knowledge of the facts cannot be recovered." Staples v. O'Reilly, 288 S.W.2d 670, 676[14] (Mo. App.1956). And the sheriff, not being entitled to recover his payments from the payees themselves, is not entitled to recover them from a third person. such as the plaintiff.

Although Rule 84.14 admonishes that we "give such judgment as the [trial] court ought to give" and "[u]nless justice otherwise requires, the [appellate] court shall dispose finally of the case," this cause presents so many items unknown to us that we are unable to determine what a full and final judgment should be from the record as it now stands. For example: if the real estate in question was actually being improved by defendant Larry Floyd at times when plaintiff knew or had opportunity to know of such action and permitted this to be done without objection or warning, equities may exist in the cause which need be weighed as between plaintiff and that defendant, provided the latter be found to have been a good faith occupant of the property. Also, if the Fulbright note was not discharged and the deed of trust not released by reason of the note being merely assigned to the defendants, this would have to be taken into account in determining the complete rights and obligations of the parties. In addition, the disposition made by the trial court and the conclusions it reached, which we have held to be error, prevented a complete determination of plaintiff's claim to rents and profits, if any. As noted at the start of this opinion, the issues and problems involved herein are so intricate, novel and difficult, that without further proceedings the parties cannot be returned to their proper position insofar as may be possible, and the equities involved, if any, cannot be decided and adjudicated. For these reasons, the judgment and decree is reversed and the cause remanded for further proceedings and findings in accordance with this opinion.

STONE, HOGAN and BILLINGS, JJ., concur.